## In re Estate of A. C. Fulton, deceased. Appeal of James S. Fulton.

*Evidence—Books of original entries—Physicians' books—Decedents' estates —Claims against decedents' estates.*

A book which shows on its face that it was not one of entries in the regular course of business, but was a separate book containing no charges except against the defendant is not admissible as a book of original entries.

Original entries need not be such as to be generally understood, if they are such as are intelligible to persons in the business, but in such case they should be supported by evidence of their meaning and character.

*Decedents' estates—Executors and administrators—Unsettled accounts.*

At the audit of an executor's account it appeared that a claimant against the estate had very close and complicated business connections with the decedent. The evidence showed real estate held in common and in trust; many payments or advances of money on account of such real estate, transfer and satisfaction of judgments; and very numerous checks passing from each of the parties to the other. The auditor separated as far as was practicable the matters involved in the personal and the real estate, and as to the latter reported that as they had not been adjusted, the orphans' court was without jurisdiction to pass upon them. The auditor's report was confirmed by the orphans' court. *Held*, that as the parties had never made any final settlement in their business relations, the orphans' court could not allow any items connected with the personal estate apart from those connected with the real estate.

*Professional services—Book entries.*

Not decided whether professional services can be the subject of proof by book entry.

Argued May 21, 1896. Appeal, No. 372, Jan. T., 1896, by James S. Fulton, from decree of O. C. York Co., confirming auditor's report. Before WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Exceptions to report of auditor, Daniel K. Trimmer.

On exceptions to the auditor's report STEWART, J., filed the following opinion:

The only contests in this estate are those arising out of the claims presented by Dr. J. S. Miller. Miller was the client of Fulton, who was an attorney at law, and Fulton was the patient of Miller, who was a physician. So that to begin with, we have the double confidential relation. In addition to this the evidence shows that Fulton and Miller were jointly interested in business transactions; at least in two real estate deals or speculations, one of which is closed by a sale of the property but the proceeds not yet divided, and the other still open, a portion of the property remaining unsold. No books were kept of any of the transactions between them, excepting Dr. Miller's books of his professional services, so far as the evidence discloses the fact, and as a logical result the auditor has been obliged to grope his way through the mass of checks, papers and memoranda and the testimony of many witnesses laid before him, with a view of approximating the truth; and his able report shows that he has accomplished the task better than might have been expected, notwithstanding his superior ability in this line.

Dr. Miller presented to the auditor and insisted upon four claims, as follows: (1) For $1,550, with interest, being the proceeds of an interest in a slate quarry, purchased by Fulton with money furnished by Dr. Miller, and sold again, and for which Fulton received the money; (2) for $350, and interest, being amount received by Fulton from the sale of real estate owned by him and Miller jointly; (3) for the sum of $3,000, with interest, being for money claimed to have been furnished by Miller for investment July 9, 1890; (4) for $2,551 for professional services rendered and medicines furnished the deceased in his lifetime.

The first two claims are virtually conceded, the exceptions as to them not being insisted upon at the argument. Indeed, in view of the proved facts, tracing the money of Dr. Miller into the properties and back into the hands of the decedent, together with the declaration of trust as to the first signed by the decedent, was conclusive as to these two claims. Their allowance, however, was resisted upon the grounds that they were met by

a claim of set-off, as were also all the claims made by Dr. Miller. This claim of set-off I will consider last.

The third claim was rejected by the auditor for the reason that it was not sufficiently proved. The evidence is perfectly clear that Dr. Miller gave to Fulton on July 9, 1890, his check for $3,000, and that Fulton got the money on it. But this standing alone proves nothing in favor of Dr. Miller except that thereby he discharged a debt of some kind which he owed to that amount to Fulton on that day. This is the legal presumption and the only one which arises in his favor from the transaction. But this attempt is made to show that this check, instead of having its presumed effect, had exactly the contrary, and that instead of discharging a debt to Fulton, it created one against him; when he is no longer here to speak, the evidence to work such a transformation ought to be distinct and clear, since the presumption, as I view it, is strongly against the creation of a liability by the check and in favor of the discharge of a debt. The law presumes that the giver of the check either paid a debt with it or received the cash at the time from the payee: Flemming's Exr. v. McClain, 13 Pa. 176; Lancaster Bank v. Woodward, 18 Pa. 357; Gettysburg Nat. Bank v. Kuhns, 62 Pa. 88. Is there evidence to accomplish such a purpose? There is an entire absence of evidence showing or tending to show that this check was intended to transfer funds to Fulton for investment. There is no declaration of Fulton in reference to this check proved, nor is there any evidence, documentary or oral, offered for nor which could show such a purpose. The evidence relied upon for this purpose is that detailed by Wesley Klinedinst and his wife, and this has no reference to this check or this specific sum of money, but to the fact that Fulton had $3,000 of Dr. Miller's for investment. This testimony is as follows:

" Q. State whether or not you had any conversation with A. C. Fulton on or about the 9th of July, 1890, and, if so, what it was? A. I couldn't tell you the date, but he said he had some money of Dr. Miller's. Q. Did he say how much? A. He said $3,000 of Dr. Miller's money; he would invest it for him. A good while after that, me and my wife came down to see him; then he wanted $10.00 to look up the docket and more besides. We didn't take the money."

On cross-examination the witness said, substantially, that Fulton said in both conversations he had Dr. Miller's money to invest; that he was alone the first time he saw Fulton on the subject; no one was present; that the conversation occurred in front of Fulton's office; that they were talking about money, and Fulton said he had some of Dr. Miller's and wanted to know if the witness knew of any one who would take it; that the witness informed Fulton that he was about buying a piece of property and may be he and his wife would take some; that he didn't ask him any particular question about it; that it was six or seven months after this before the second conversation took place; that this also took place at Fulton's office; that he asked him, Fulton, if he could get that money of Dr. Miller, and he said yes; that Fulton then wanted $10.00 to look up the docket and that witness and his wife refused to pay it.

Rebecca Klinedinst testified that she was present at the conversation between her husband and Fulton, the second conversation; that Fulton said he had some money to invest and that it was Dr. Miller's, $3,000; that Fulton wanted $10.00 to do the writing; that this conversation was in July, as near as she could tell, because she wanted to pay off the property, but couldn't say what year it was.

This witness affirmed the first question put to her, which assumed that the second conversation on the subject took place six months or a year later than the first.

Wesley Klinedinst, her husband, testified that he couldn't tell the date of the first conversation, but the question assumed it took place in July, 1890, and he testified that the second took place six or seven months after the first or longer.

Can it be said that this evidence is sufficiently clear and potent to overcome the presumption that the check for $3,000 was given in payment of a debt, and show that it was an advance of money for investment? It seems to me that to ask the question is to deny the proposition. The mind is left altogether in uncertainty as to what this testimony establishes. It is vague and uncertain as to time. It does not show that Fulton made the declaration that he had $3,000 of Dr. Miller's money about the time of its receipt, but that he still had it uninvested, any time from six months to one year after the first conversation. It is possible that Dr. Miller would have permitted that sum of

money to lie idle in his counsel's hands for that length of time uninvested, and yet a finding in his favor would establish the fact that he had done so, and that it continued in his hands still uninvested from July 9, 1890, to the time of Fulton's death, in February, 1892. Such a proposition is altogether improbable, and therefore I am satisfied that the auditor properly rejected this claim.

The fourth claim is that for professional services rendered. The auditor allowed a portion of this claim and rejected the remainder, for the reasons given by him. To this action both sides have excepted; the one for not allowing more, the other for allowing any part of it.

The auditor's report bears testimony of the high character of the physician, which is justified by the facts, but after allowing the first portion of his book account, he rejects the remainder, because the book is not sufficiently established as a book of original entries. The doctor's account or pass book was admitted for the purpose of proving the first portion of the account, and is established by the oath of the claimant, and was therefore satisfactory to the auditor's mind. The book itself is in evidence, therefore, but some of the items are rejected. The items from and including October 15, 1887, to August 4, 1888, charged almost daily during that period are admitted. These items are with a single exception as follows : Taking April 24, 1888, as an example—" To irrigate bld. $3.00." The one exception is the first one as follows—" October 15. To 2 visits, $3.00."

This account terminates on August 4th as stated, and the rejected account begins as follows :

Sept. 2, 1888.

A. C. Fulton, Dr. to J. S. Miller.

| | |
|---|---|
| Aug. | $10. |
| Medicine for Aug. & Sept. | 12.25 |
| Nov. 3. To Philada Agnew. | 25. |
| Nov. 5. To Medicine. | 2. |
| Nov. 8. To Medicine. | .50 |
| And later on as follows : | |
| Dec. 10. Atomizer, &c. | $ 2. |
| 10. Appli throat. | 1. |
| 12. " " | 1. |

\*    \*    \*    \*    \*    \*    \*    \*

| | | |
|---|---|---|
| Jany. 14. To Visit. | $ | 1. |
| Feby. 3. Visit and Appli. | | 2. |
| 6. Medicine & throat. | | 2.50 |
| Mch. 2. Analysis of urine. | | 3. |
| 5. Treatment. | | 1. |
| Apr. 25. To. Ex. Urine. | | 3. |
| Oct. 2. To Visit. | $ | 1. |
| 3. " | | 1. |
| 4. " | | 1. |
| 5. " | | 1. |
| 6. " | | 1. |
| 1890. | | |
| Feby. 6. Catheter. | | 1. |
| June 24. Passing sand. | | 1.50 |
| Aug. 4. " sand. | | 1.50 |
| Nov. 2. To Drawing Urine. | | 2. |
| Jany. 1, 1891. To Med. | | 2. |

I have given this number of items, twenty-four out of a total of about three hundred and fifty, with a view of showing their general character. The total charges in this rejected account aggregate, according to the footings, $818. Of this amount there are ten charges of this character: "To Agnew Philada $25," or "to Philada Agnew $25," aggregating $250; also two lumping charges at the beginning of the account, "To treatment for August $10, and for medicine for August and September $12.25."

These lumping charges must of course be rejected, but they do not vitiate the proper charges, since some entries may be admitted and others rejected without destroying the book as an instrument of evidence: Ives v. Niles, 5 Watts 324; Wollenberger v. Katterlinus, 17 Pa. 389.

If not expressly decided by the Supreme Court, it has been tacitly admitted by the lower courts of this state that the memorandum or charge book of a physician may be admitted in evidence if in proper form and properly proved: Van Bibber v. Merritt's Exr., 12 W. N. C. 272; German's Estate, 14 W. N. C. 192. In the last case Judge ASHMAN said of such book, "It may cover a daily entry of each visit, with the name of each

patient, a list of the medicines furnished and the price which custom has fixed for the particular service. Such a record will comprise all the incidents of certainty of time, person, labor and value, and each entry will be complete in itself. No more than this is required in the books of an artisan, and the measure of necessity is at least as great in the one instance as the other."

Applying this rule, so full and expressive of what ought to be the rule as to require neither addition nor pruning, to the case in hand, and what is the result? The book contains a daily entry of each visit, the name of the patient (no other being kept in this book for the sufficient reason brought out in cross-examination), a list of the medicines furnished, and the price presumed to be that fixed by custom for the particular service. This rejected account contains all these elements, excepting that it does not specify the kind of medicine, the quality, nor the price of each kind, but these charges run from fifty cents to $2.50, no one being in excess of that amount, and in numerous instances medicine and something charged with it only amount to $2.00 or $2.50, so there were no large quantities furnished at any one time, only such as are covered by an ordinary prescription. Each item contained date, year, month and day in regular order, character of service or subject of charge, brief, yet intelligible and amount of charge. The book bears upon its face the impress of honesty and truthfulness, and the testimony shows it was in the hands of the claimant's counsel from the day on which an effort was made between him and the decedent's representatives to settle their accounts, until produced at the audit, and I am fully convinced that the charges it contains are honest ones for services rendered.

The claimant was subjected to a lengthy cross-examination as to this book. Every item of charge in the book as well as the prices charged was open to attack, and yet in this lengthy cross-examination, not one was attacked; nor were any witnesses called to disprove the value of any of the services, nor of the things furnished.

The book entries being proper evidence, they are prima facie correct, and no evidence to the contrary being offered, they become conclusive. I therefore admit all the items contained in the rejected account, excepting the items aggregating $250,

for services to Philada or to Agnew, and the two lumping charges at the beginning of the account.

This now disposes of all the questions excepting that of the accountants' set-off, and this I will consider next. The auditor refused to consider the question of set-off raised by the accountants against Dr. Miller's claims, on account of the multiplicity of the transactions shown to have taken place between them and which seemed to have some connection with or growing out of their real estate transactions. Was he correct in this? As shown by the evidence there were money transactions between the decedent and claimant, covering a period of several years and involving the purchase, improvement, disposition of real estate and its profits, and virtually constituting partnership dealings. No final settlement is shown to have taken place between them ; and on the contrary, what evidence there is on the subject shows there was not. Claims and counterclaims, set-off and counter offsets were introduced ad infinitum, and the introduction of checks or papers showing receipt of money by one from the other was immediately followed by the counter production of other liabilities to offset it until it is not surprising that the auditor should decline to undertake the adjustment of these accounts. It was shown that the decedent built houses on ground jointly purchased by claimant and decedent and paid for the same with his own checks, and that at the same time the claimant was transferring funds or making payments to the decedent. These matters have not been adjusted, and until they are the orphans' court cannot entertain jurisdiction of them, since should it determine that Dr. Miller is indebted to the decedent on account of them it could not enforce payment thereof by him: Weigley v. Coffman, 144 Pa. 489. I decline therefore to allow the claims of set-off, without prejudice to the parties however to ascertain and adjudicate the same in the proper forum—and this applies also to the rejected claim of $3,000, disallowed to Dr. Miller in this distribution. I therefore dismiss all the exceptions filed by the accountants and James Fulton, and all exceptions filed by Dr. Miller excepting the fifth, which I have in part sustained, also the sixth.

*Errors assigned* were in dismissing and sustaining exceptions to auditor's report.

*R. E. Cochran*, of *Cochran & Williams*, and *N. M. Wanner*, with them *George S. Schmidt*, for appellant.—The account books of a merchant are evidence of the sale and delivery of goods and merchandise, but they must be books of original entry, and the entries must be shown to have been made on the day of the sale and delivery of the goods: Walter v. Bollman, 8 Watts, 545; Harlocker v. Gertner, 4 Clark, 191; German's Est., 14 W. N. C. 192; Butterweck's Est., 4 Pa. D. R. 563.

If these accounts are of the character placed upon them by the court below, the claimant must prove that, upon the adjudication in the proper form, the estate of the decedent is found to be indebted to the claimant, who should then base his claim to recover in the orphans' court upon such adjudication.   Having failed to do that his claim must be rejected in toto.   The principle must be applied to the claimant's case as well as to matters of defense or set-off: Weigley v. Coffman, 144 Pa. 489; Brown's App., 89 Pa. 139; Miller's Est., 136 Pa. 349; Ainey's App., 2 Pennypacker, 192; Fessler v. Hickernell, 82 Pa. 152.

*Edward Chapin* and *N. Sargent Ross*, for appellee.—A physician may have a book of accounts upon which a claim may be based: German's Est., 14 W. N. C. 192.

It is not consistent, equitable, just, or legal, that this court should be asked to recognize the unexplained checks and papers of the appellant, and entirely reject the checks and papers which were offered to rebut any presumption that the appellant's offers might have raised.

OPINION BY MR. JUSTICE MITCHELL, October 5, 1896:

The first question raised is on the proof of the claim of Dr. Miller for medical services to the decedent.   The book produced contained a large number of entries, beginning more than six years before the presentation of the claim.   The auditor disallowed all that appeared to be barred by the statute of limitations, all lumping charges, a large number of items not self explanatory, and allowed the rest.   The learned judge below sustained an exception by the claimant and allowed all the charges within six years, except those containing a lump sum for items not particularly specified.   There were other questions raised both as to the claim itself and the mode of

proof, but in the view we take of the case it is not necessary to notice them.

How far books of original entry may be received as evidence of services of a professional character has not been settled in this state. The earlier cases are full of expressions that such entries are evidence at all only from necessity, and that the custom to which such necessity gave rise extended only to goods sold and labor performed, and that it was exceptional and dangerous in character and would not be extended : Crouse v. Miller, 10 S. & R. 155 ; Curren v. Crawford, 4 S. & R. 3 ; Churchman v. Smith, 6 Wh. 146, 151. In Hale's Exrs. v. Ard's Exrs., 48 Pa. 22, the question as to attorney's charges was left undecided, but it was said by STRONG, J., " None of the entries were such as the law admits to be evidence of indebtedness to the persons who made them. Books of original entries are evidence to prove a claim for goods sold and services rendered, if made in the regular course of.business, but as they are evidence made by a party for himself, and very often incapable of being tested by other proof, they are to be guardedly received, and only to prove a sale and delivery, or labor for the alleged debtor for which the law implies a promise to pay." How far, if at all, subsequent practice has enlarged the strict limits thus laid down we do not need to consider, for reasons to be stated presently.

Nor is it necessary to enter upon a discussion of the self-sustaining character of the charges in dispute. It has been held that the charges need not be such as to be understood by the general public if they are intelligible to persons in the business, but where they are not intelligible to the common understanding, it would seem to be necessary to support them by other evidence as to their meaning and character : Hough v. Doyle, 4 R. 291.

But there is an insuperable objection in the present case, that the book is not one of entries in the regular course of business. It is a separate book containing no charges except against the decedent. This is explained to have been at the decedent's request, but the claimant was not a competent witness to prove such request. No precedent has been shown for the admission of such a book, and the analogies are all against it. While the question does not seem to have arisen in this form yet all the au-

thorities hold that the books must show that they are kept in the regular routine of business. That is one of the greatest safeguards of the reliability of such evidence. Thus alterations or interlineations will discredit the book, and unless explained will keep it from the jury: Churchman v. Smith, 6 Wh. 146; its general character may be impeached by showing irregularities in other accounts than the one in issue; Funk v. Ely, 45 Pa. 444; unconnected slips of paper showing charges are not admissible as a book of original entries : Thompson v. McKelvy, 13 S. & R. 126; entries, even in a regular book, are not evidence of the sale of an article not in the party's business : Shoemaker v. Kellog, 11 Pa. 310 ; Stuckslager v. Neel, 123 Pa. 53; and in Smith v. Lane, 12 S. & R. 80, it was said by TILGHMAN, C. J., "It is a great objection to these books that they do not contain a daily entry of the general transactions at the mill."

After a diligent search of the digests I have not found any precedent on this exact point, but two cases in New Jersey are instructive as showing the general judicial view in that state to be in accord with our own. In Wilson v. Wilson, 6 N. J. Law, 95, the disputed entries were for cash paid, advanced or lent, and some of them were written on one of the last leaves of the book with blank leaves between them and the other accounts. FORD, J., was of opinion that none of the cash entries was admissible, and KIRKPATRICK, C. J., while not going so far, concurred in excluding the separate entries at the end of the book. In discussing the subject of book entries at some length, he said, "A book of daily entries, containing accounts with different people touching matters in which a man is known to deal or be employed, and which according to the custom of the country are usually made matter of account, has been admitted as evidence for the jury under all the circumstances of the case, while a detached paper, which might have been made up for the occasion has been wholly rejected. . . . Now these last entries appear to me to be no part of the book, properly speaking, but to stand precisely in the situation of a detached paper, and to derive no credit at all from their being written within the cover of the book, seeing they are written upon pages wholly detached from the daily entries and accounts." And in Swing v. Sparks, 7 N. J. Law, 59, the same learned judge mentioned among other objections to entries, that they were "all the account

against Johnson, in one continued series, without a single intervening charge."

We are of opinion that the regularity of the account as to its place in the ordinary books of the business is as necessary as its regularity in other respects, and that this book, failing in that requirement, must be rejected altogether.

The second question relates to the rejection of the appellant's claim of set-off and credits. The decedent and Dr. Miller had very close and complicated business connections. The evidence shows real estate held in common, or in trust; many payments or advances of money on account of such real estate; transfer and satisfaction of judgments; and very numerous checks passing from each of the parties to the other. Through this tangled mass the auditor has gone with great intelligence and exemplary industry, and we should not think of questioning or reviewing the results he arrived at, approved as they are by the court below, were it not entirely clear that the scope of his inquiries was too much restricted by considerations of jurisdiction to enable him to do full justice to the parties or terminate the litigation. He separated so far as was practicable the matters involving personal and real estate, and as to the latter, he reported: " the matter of ascertaining the respective interests of the decedent and the claimant in said real estate, and the adjustment of the same, requires other proceedings, and to such proceedings the auditor is of opinion should be referred for adjudication and settlement all the checks, payments and other matters arising out of or pertaining to said real estate transactions." The court reaching the same conclusion said, " no final settlement is shown to have taken place between them; and on the contrary what evidence there is on the subject shows there was not. Claims and counterclaims, set-off and counter offsets were introduced ad infinitum, and the introduction of checks or papers showing receipt of money by one from the other was immediately followed by the counter productions of other liabilities to offset it. . . . . It was shown that the decedent built houses on ground jointly purchased by claimant and decedent, and paid for the same with his own checks, and that at the same time the claimant was transferring funds or making payments to the decedent. These matters have not been adjusted, and until they are the orphans' court cannot en-

tertain jurisdiction of them. . . . I decline therefore to allow the claims of set-off, without prejudice to the parties however to ascertain and adjudicate the same in the proper forum." The difficulty with this proposed separation of the claims and the offsets is that it is not practicable. The parties made no such separation and the court cannot do it now. The appellee's own evidence shows that apart from the item of medical attendance his claims are for items in a long, complicated and unsettled account. The auditor, with great ability, showed that two items, the slate quarry claim and the Klinedinst claim, were capable of separate statement and settlement, but he could not show that the parties had ever so stated or settled them. On the contrary the evidence is that they never did so, and there is nothing to enable the court to say that when the whole account is stated the balance due by decedent on these two items may not be offset by a balance due to him on others. The effect of the adjudication is to allow appellee to enforce payment of part of an admittedly unsettled account, and to turn over the other side to another suit for what may be due to him. This cannot be done. The matters are closely interwoven, and were never separated by the parties ; they must go together to a common settlement now. The orphans' court could not deal adequately with the whole account, nor can we in this proceeding. None of the items therefore can be allowed separately.

This is a regrettable controversy. The decedent and the claimant stood not only in the double professional relations of counsel and physician to each other but in close business and personal association. For this reason probably their business matters were confined to their own knowledge, and conducted without regard to business formality or prudence, and the sudden death of Mr. Fulton left them so mixed that no tribunal now is likely to be able to say with confidence that it has reached a solution certainly correct. It is a case for amicable adjustment by reference to one or more arbitrators to take up the whole account in the same capable manner that the learned auditor took up the part that he thought within his jurisdiction and reach as .equitable a result as is now possible. Failing to agree on this however the parties must be left to their remedies on the matters as a whole.

Decree reversed, account to be restated in accordance with this opinion.