## NICOLA v. UNITED STATES.
### No. 5248.

Circuit Court of Appeals, Third Circuit.
Aug. 9, 1934.

Maynard Teall, Joseph A. Richardson, and Smith, Shaw, McClay & Seifert, all of Pittsburgh, Pa., for appellant.

Horatio S. Dumbauld, U. S. Atty., John A. McCann, Sp. Asst. to the U. S. Atty., and James I. Marsh, Asst. U. S. Atty., all of Pittsburgh, Pa. (E. Barrett Prettyman, Gen. Counsel, Bureau of Internal Revenue, and I. W. Carpenter, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for appellee.

Before WOOLLEY, DAVIS, and THOMPSON, Circuit Judges.

DAVIS, Circuit Judge.

This is an appeal from a judgment of conviction entered upon the verdict of a jury.

F. F. Nicola, hereinafter called defendant, was indicted, tried, and convicted for attempting to defeat and evade a part, $26,394.20, of his income tax for the year 1928, in violation of section 146 (b) of the Revenue Act of that year (26 USCA § 2146 (b) which provides that:

"(b) Any person required under this title to collect, account for, and pay over any tax

imposed by this title, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."

While the evidence was complicated and technical and consisted almost entirely of voluminous books of account interpreted by expert opinions, the issue itself was comparatively simple.

The Miller Printing Machinery Company, hereinafter called the Miller Company, a corporation mostly owned and controlled by the defendant, sold certain patents and other personal property in 1928 to Brandtjen & Kluge, Inc., for $675,000 in cash on which there was a sales commission of 15 per cent. or $101,250. This commission was credited by the Miller Company on the day the sale was completed to the Point Improvement Company, hereinafter called the Point Company, a corporation of which the defendant was president, as income to it and was so returned by the Point Company. The contention of the government is that this commission was really the income of the defendant which he did not return and on which he did not pay the tax as personal income to himself, though it was paid by the Point Company, at the rate applicable to it, to the government and is still retained by it.

The inducement, according to the government, to have the return made by the corporation rather than the defendant was to secure a lower tax rate. If this contention is true, the defendant would thus save the difference between the higher and lower rate.

There was no real contradiction between the evidence of the government and defendant. The government relied mainly upon entries in the books of account interpreted in the light of a certain typewritten letter, Government Exhibit No. 15. The defendant contends that these entries, when properly interpreted, show that this commission was income of the Point Company and not of himself.

The defendant contends that the judgment should be reversed and a new trial granted for several reasons:

I. Because prejudicial error was committed in the admission of evidence.

1. The first specification relates to the admission of the following typewritten letter:

"Mr. Girts: Herewith find a number of salesmen's items that I have taken over from the Miller P. M. Co. on which the collections are expected to be made and credited to me.

"Report to me on this the 15th of every month. I have not entered these on my books although I may do so in connection with taxes if we can declare a loss without bringing suit.

"It is very important that I have directly and I know this will take a great deal of time and overtime a study of what shift is necessary for me to put on the various books in connection with profits and losses for 1928. As we understand it, there is a heavier tax on the individual than on the corporation and therefore I want to pass as many of these profits through land companies like the Point Improvement Company, Nicola Bros. Co., or Nicola Land Co. as I can. Make a careful survey of all of this year's transactions. I anticipate in view of having sold 240 shares of Chase National Bank that I will have a very large amount to account for there.

"Let me know what each one of the companies seem to have in overhead burden that would be an offset to possible profits that might be swung to them.

"F. F. Nicola."

This letter was found and secretly copied by Henry A. Wolf, a government agent who examined the books. It was pinned to a voucher relating to the account of a number of salesmen, which had been taken over from the corporation by the defendant. It was not only typewritten, but the name "F. F. Nicola" which it bore was also in typewriting. There was no evidence establishing who wrote it, who pinned it to the voucher, or who left it in the book. It was entirely unidentified and unproved. Was it admissible against the defendant?

"The generally accepted rule is to the effect that the mere fact that a letter (other than a reply letter) purports to have been written and signed by the person in question is insufficient to establish its authenticity and genuineness. * * * This rule is especially applicable where the letter is typewritten or printed and the signature is attached by a rubber stamp or stencil, or is typewritten or printed." 9 A. L. R. 987, 988, note.

A letter does not prove itself. In order to make it evidence, it must be shown either to have been written by the person

against whom it is produced, or by some one authorized to act in his behalf. Neither the authenticity nor genuineness of this letter was established by any evidence. Its admission was clearly erroneous, and unless it appears "beyond a doubt that the improper evidence admitted did not and could not have prejudiced the rights of the party duly objecting," a new trial should be awarded. Sprinkle v. United States (C. C. A.) 150 F. 56, 59; McGowan v. Armour (C. C. A.) 248 F. 676; Sweeney v. Oil & Gas Co., 130 Pa. 193, 203, 18 A. 612; Boston & Albany R. Co. v. O'Reilly, 158 U. S. 334, 337, 15 S. Ct. 830, 39 L. Ed. 1006. Counsel for the government frankly admitted at the argument that without this letter they would not have a case.

 Being entirely unproved, its admission violates the fundamental rules for the admission of writings and documents, unless it can be admitted on the theory, for which the government contends, that it was pinned to the voucher and, therefore, became part of the books of account or part of the voucher and so was admissible as an original entry or part of the voucher. But the nature of the letter and the meager facts about it make it inadmissible on this theory. A book of original entries and also an account book of secondary entries is one in which a detailed history of business transactions is entered. Books of account consist of entries made in the regular course of business showing the transactions which have actually occurred in the business and not of orders, executory contracts, things to be done subsequent to the entries, or of methods and principles according to which the business must be conducted and entries made. Laird v. Campbell, 100 Pa. 159, 165; Fulton's Estate, 178 Pa. 78, 87, 89, 35 A. 880, 35 L. R. A. 133. In book entries relating to sales, if the goods are charged before the contracts of sale are complete, the books are not competent evidence. They should be guardedly received in evidence and then only if made in the regular course of business. In order to make a book entry admissible as evidence, it must be the registry of a sale and delivery or a transaction actually made of the things therein contained, at the time of their being so entered. Fairchild v. Dennison, 4 Watts (Pa.) 258.

 But assuming that the letter was genuine and its execution proved, it purported to give the bookkeeper certain instructions to be observed by him in the allocation of profits in tax returns and was then by him or some one left attached to a voucher by a pin. The pin has no significance and no more makes it an entry in the books or a part of the book of accounts or a part of the voucher to which it bears no logical relation than if it had been left with the voucher unattached. It was a mere separate piece of paper and could not be treated as a part of the voucher or book of original entry. Rudy v. Myton, 19 Pa. Super. 312, 318. If this letter was properly admitted, then any unproved and unsigned letter may be admitted against a defendant in any civil or criminal case, if some person, friend, or foe, without authority, writes it on a typewriter and pins it to a voucher or some piece of paper and leaves it in an account book. The letter shows upon its face that it was not intended to be a part of the voucher or an entry in the books. It relates to no transaction made in the regular course of business and its character and purpose cannot be changed into a proper entry in a book of accounts or made a part of the voucher by the magic of a pin or the place where it was found. Its admission on this or any other theory is untenable. Its admission in evidence was prejudicial and erroneous.

The learned trial judge admitted the letter on the authority of Lisansky v. United States (C. C. A.) 31 F.(2d) 846, 851, 67 A. L. R. 67. In that case the question was whether or not government agents could testify to the contents of records of defendants used by the government agent while examining their tax returns about whose authenticity and genuineness there was no question. The court held that although the government could not compel the production of the records which had been voluntarily turned over to the agents, the agents could testify to their contents, which they had secured with the consent of the defendants, without violating the Fourth and Fifth Amendments to the Constitution. The court in that case based its ruling on the cases of Hester v. United States, 265 U. S. 57, 44 S. Ct. 445, 68 L. Ed. 898, and Olmstead v. United States, 277 U. S. 439, 48 S. Ct. 564, 72 L. Ed. 944, 66 A. L. R. 376. In the Hester Case the question was whether or not it violated the unreasonable search and seizure provision of the Fourth Amendment to permit prohibition agents to testify to seeing defendants, while they were concealed 50 to 100 yards away from the house, take from a car a jug of intoxicating liquor, etc. In the Olmstead Case, the question was whether or not it violated the Fifth Amendment to permit testimony of conversations heard over tapped telephone wires. The Supreme Court held that it did not. But the court below went much further in the case at bar than the Li-

sansky Case went. It is clear that the letter could not be admitted on the authority of that case.

2. The second specification of error relates to the admission of the books or testimony as to their contents.

Section 1104 of the Revenue Act of 1926, as amended by section 618 of the Revenue Act of 1928 (26 USCA § 1247), provides that:

"The Commissioner, for the purpose of ascertaining the correctness of any return or for the purpose of making a return where none has been made, is hereby authorized, by any officer or employee of the Bureau of Internal Revenue, including the field service, designated by him for that purpose, to examine any books, papers, records, or memoranda bearing upon the matters required to be included in the return, and may require the attendance of the person rendering the return or of any officer or employee of such person, or the attendance of any other person having knowledge in the premises, and may take his testimony with reference to the matter required by law to be included in such return, with power to administer oaths to such person or persons."

Section 146 (a) of the Revenue Act of 1928 (26 USCA § 2146 (a) provides that:

"Any person required under this title to pay any tax, or required by law or regulations made under authority thereof to make a return, keep any records, or supply any information, for the purposes of the computation, assessment, or collection of any tax imposed by this title, who willfully fails to pay such tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than one year, or both, together with the costs of prosecution."

Two questions arise here: (1) Was the admission of the testimony of Wolf a violation of the constitutional provision contained in the Fifth Amendment that no person shall be compelled in any criminal proceeding to be a witness against himself? (2) If it was a violation, did defendant waive his constitutional privilege by not refusing to grant permission to Wolf to examine the books and by not failing to supply the information to enable him to compute the tax and ascertain the correctness of the return?

The trial court seemed to be of the opinion that the admission of Wolf's testimony would have been contrary to the constitutional inhibition, if the defendant had seasonably objected or refused to produce his books for examination, but that not having done so, he thereby waived the privilege. He said: "If Mr. Nicola had not been willing to have his books examined, and if he had been compelled to produce them, then we would have presented an entirely different question."

The purpose of requiring the taxpayer to supply the information was to enable the Commissioner to compute the tax and ascertain its correctness, and the taxpayer, under the provisions of section 146 (a) quoted above, could not refuse to supply the information to carry out this purpose without being guilty of a misdemeanor for which he might be indicted, convicted, fined, and imprisoned. If he had refused and claimed immunity under the Fifth Amendment, the government could have pursued one of two courses: (1) It could have presented his refusal to a grand jury and had him indicted, or (2) it could have resorted to the District Court under the provisions of section 617 (a) of the Revenue Act of 1928 (45 Stat. 877, 26 USCA § 2617 (a) to compel his testimony and the production of his books. At either time, the trial of the indictment or the hearing before the District Court to compel testimony, the question of his constitutional guarantee would have been available as a defense.

■■ But he did not refuse to supply the information required. Did he waive his privilege? The constitutional guarantee is for the benefit of the witness and unless invoked is deemed to be waived. U. S. ex rel. Vajtauer v. Commissioner of Immigration, 273 U. S. 103, 113, 47 S. Ct. 302, 71 L. Ed. 560. Was it necessary for the defendant to invoke it in the first place before the revenue agent or could he wait until his trial on indictment for attempting to evade a part of his income tax? Under the authority of McKnight v. United States (C. C. A.) 115 F. 972, 981, Lisansky v. United States, supra, and United States v. Murdock, 284 U. S. 141, 148, 149, 52 S. Ct. 63, 65, 76 L. Ed. 210, 82 A. L. R. 1376, it was necessary for him to claim immunity before the government agent and refuse to produce his books. After the government had gotten possession of the information with his consent, it was too late for him then to claim constitutional immunity. The facts thus secured could be proved by secondary evidence. The inadmissibility of the letter rests upon a different principle. In the Murdock Case the Supreme Court said: "As

appellee at the hearing (before the revenue agent) did not invoke protection against federal prosecution (but did against state prosecution), his plea is without merit and the government's demurrer should have been sustained. * * * The validity of his justification depends, not upon claims that would have been warranted by the facts shown, but upon the claim that actually was made." If the failure to make the claim for immunity on the proper legal ground at the hearing before the revenue agent, waived his privilege, a fortiori the failure to claim his privilege on any ground waived it.

II. The next reason alleged for reversal is because the evidence, if admissible, was insufficient to submit to the jury or to sustain the verdict.

As the court charged, the essential fact to be proved was that the commission of $101,250 was the personal income of the defendant and not that of the Point Company. This the government sought to prove by the testimony of Henry A. Brandtjen, by the book entries, and by the typewritten letter.

1. Mr. Brandtjen testified that his company purchased certain patents from the Miller Company for $675,000 between September 13, 1928, and October 23, 1928, and that the negotiations and the sale were conducted on the part of the Miller Company by its directors; two meetings were held, one at the Farmers' Bank building of Pittsburgh and the other at the building of the Point Company.

This testimony was, of course, a circumstance which was properly in the case, but it had no probative value. The purpose of it was to show that the defendant was not only instrumental in effecting the sale, but that he did it for himself personally and not for, and as president of, the Point Company. Either might have been true, but it is significant that the last meeting, where the sale was consummated and the final 90 per cent. of the purchase price, $607,500, was paid, was held in the building of the Point Company, rather than at the office of some one of the defendant's other companies which admittedly had no connection with this transaction.

2. As to the books, no intimation has been made that any business was done which was not entered in the books, or that they have been altered in any particular. The record stands as originally made. Both sides rely upon it as correct.

On the day, October 23, 1928, when the sale was completed, the purchase money fully paid, and the commission earned, the Miller Company charged the sales expense with the commission and credited the Point Company with it. The Point Company later made the entries in its books and credited its account with this same amount as commission on the transaction. On October 31, 1928, the Miller Company debited the Point Company with this amount and credited it to the defendant as "per instructions of F. F. Nicola, per L. Girts," who was in charge of the books of the Point Company, but not of the Miller Company. The Point Company credited the Miller Company with the $101,250 and charged defendant with the same, and defendant on his books thereupon debited the Miller Company with that amount and credited the Point Company with it. The transaction thus reduced the defendant's debt to the Miller Company but increased it by just that much to the Point Company. He was no richer and no poorer than before but owed the Miller Company less and the Point Company more. That is, the effect of the transaction and various entries is that at the end of 1928, when the entries were closed in all the books, the defendant owed the Point Company the commission of $101,250. This is unquestionably shown by the entries in the books and admitted by the government's expert witnesses, who examined them. So that the entries began with crediting this commission to the Point Company and likewise ended with making the commission the Point Company's and the defendant its debtor to that extent. This must be the fact unless the entries are false and there is no competent evidence to establish that they are. If the books, therefore, are reliable, the commission belonged to the Point Company.

The Point Company had to make the return of this commission in its income after it had been credited to it by the Miller Company, otherwise it would have been guilty of making and filing a false return.

3. The third piece of evidence by which the government claims to have established that this commission was the defendant's and that the entries to the contrary were made with criminal intent, was the typewritten paper quoted above.

This letter shows an honest or dishonest and fraudulent purpose. It speaks of what shifts it was necessary to put on various books, and the desire of the defendant to pass as many of the profits through land companies as he could because he understood that there was "a heavier tax on the individual than on the corporation." His understanding

as to the heavier tax was correct and there was nothing morally or legally wrong in desiring to avoid, but not evade, his taxes and to take proper and legal steps to do this. If by shifts put on the various books and the passing of profits through land companies he meant that these "shifts" and "passings" were not to represent the facts and real transactions, he had a criminal intent. There is no evidence that the defendant in making this sale was not operating through the Point Company from the beginning and the evidence would indicate that he was.

But if the "shifts" and "passings" represented facts and real transactions, the operation through his different corporations rather than individually and personally, or the shift from operating through a particular corporation in one enterprise to another corporation in another enterprise in order to lower his tax rate, he was within his legal rights and was not guilty of violating the law. United States v. Isham, 17 Wall. (84 U. S.) 496, 21 L. Ed. 728; Bullen v. Wisconsin, 240 U. S. 625, 36 S. Ct. 473, 60 L. Ed. 830; Superior Oil Co. v. Mississippi ex rel. Knox, 280 U. S. 390, 50 S. Ct. 169, 74 L. Ed. 504; Clapp v. Heiner, 51 F.(2d) 224 (C. C. A. 3). In view of the fact that there is no evidence showing that any entry in any or all of the books did not represent the fact which it purported to represent, or that there was an alteration of any entry, or that there was a false entry in any of the books, it is reasonable and legal to infer that he meant "shifts" and a "passing" within the law. "Unless there is substantial evidence of facts which exclude every other hypothesis but that of guilt, it is the duty of the trial court to instruct the jury to return a verdict for the accused; and where all the substantial evidence is as consistent with innocence as with guilt, it is the duty of the appellate court to reverse a judgment of conviction." Union Pacific Coal Co. v. United States, 173 F. 737, 740 (C. C. A. 8); Wiener v. United States, 282 F. 799, 801 (C. C. A. 3); Yusem v. United States, 8 F.(2d) 6 (C. C. A. 3); Ridenour v. United States, 14 F.(2d) 888 (C. C. A. 3).

It cannot be said that the substantial evidence of the facts in this case exclude every other hypothesis than that of guilt and we do not think that the competent evidence is sufficient to sustain the verdict.

III. The third reason urged for reversal is that the learned trial judge erred in charging the jury as to the time when it was necessary to make the allotment of the commission in order to make it legally effective.

1. He charged the jury that "it was not unlawful for the defendant to apportion business transactions among himself and the several corporations, one transaction to one corporation and another to another corporation; and if such apportionment, in any instance, was due to the defendant's desire to keep down his taxes of his several corporations, the apportionment would not be unlawful on that account alone," but that such apportionment must be made "at or prior to the inception of the business and not subsequent to its completion."

Here there were two times when the allotment could be made; "(1) Prior to the inception of the business, or (2) at its inception."

Then followed a statement as to the time when the allotment could not be made, "not subsequent to its completion." This carried an implication that, if made prior to the completion, it would be effective. The implication was expressly charged later when the court said that the defendant "might allot business transactions to himself or to the corporations, as the circumstances of the case might seem to warrant, but that allotment, in order to be effective, must be made before the transaction was completed, and not afterwards." Under this instruction, the allotment might be made at any time before the completion of the transaction. This is contrary to the time mentioned in the previous instruction that it had to be made "at or prior to the inception."

At what exact time the allotment had to be made was important for the jury to know. It was confused by these instructions. So after being out all night, it returned at 10:30 in the morning and requested to be instructed as to the time when the allotment must be made, and the court instructed it as follows:

"Allotment, in order to be effective must be made before the transaction was completed and not afterwards—that is, before the inception of the transaction. He could not wait until they had begun and were nearly through with the transaction. Our instruction was that the allotment should be made before the inception or beginning of the transaction."

Here again there were two times when the allotment must be made in order to be effective: (1) Before the transaction was completed and not afterwards. (2) Before the inception of the transaction.

This instruction likewise confused the jury. The first statement as to the time was that the allotment "must be made before the transaction was completed and not afterwards." That language was plain and clear and meant that the allotment could be made at any time up to the moment of the completion of the transaction. But the court then explained the language by saying, "That is, before the inception of the transaction. He could not wait until they had begun and were nearly through with the transaction."

The jury was still in doubt. It did not know whether the allotment had to be made prior to the inception, at the inception, or some time before they were nearly through, or before the completion of the transaction. In this state of mind the jury retired and at 12:40 p. m. It returned and asked the following written question:

"The Jurors in the case against F. F. Nicola believe you stated that Mr. Nicola would be acting entirely within his rights in allotting any commission earned from his services rendered Miller Printing Machinery Co. to himself or any of the corporations in which he was accustomed to transact business. The question, if this statement is correct, is just what point marks the line or time when this decision must be made by Mr. Nicola to make his decision valid."

To this the court replied:

"Gentlemen, in my original charge and in the further instructions which I gave you this morning, I did not state that Nicola would be entirely within his rights in allotting any commissions earned from his services rendered the Miller Printing Machinery Company to himself or any corporation with which he was accustomed to transact business. I did say this morning, and I reiterate at this time, that Mr. Nicola, as the head of these different organizations, might allot different transactions to one or the other of the corporations or to himself, but that that allotment must be made prior to entering into the transaction.

"With reference to the particular matter under consideration here, and that is the commission for the sale of patent rights, if Mr. Nicola desired to employ the Point Improvement Company to carry on that negotiation with reference to the sale of those patent rights, he should have made that decision when the negotiations for the sale of those patent rights took place,—that is, before the negotiations—so the negotiations for the sale of the patent rights would be carried on by the Point Improvement Company in behalf of the Miller Printing Machinery Company.

"You heard the testimony of Mr. Nicola as to just how that matter was carried on. You heard the testimony of the representative of the seller, who was present at some of the negotiations with reference thereto. The point I wish to make is this: that the allotment of this project to the Point Improvement Company should be made before the commission was earned and not afterward."

The defendant insists, and there seems to be some reason and authority for his contention, that the commission was not "earned" until the sale was completed and it was certain that there would be a commission. At any rate the final instruction did not inform the jury when the commission was "earned" and whether or not the allotment had to be made before the work of earning it began, or at some time while the work of earning it was being done, or when that work had been finished and the sale completed. The several times mentioned left the jury in doubt. Where two instructions are given to the jury, one erroneous and prejudicial and the other correct, it is impossible to tell which one the jury followed and it constitutes reversible error. When an erroneous instruction has been given, it is not cured by a subsequent correct one, unless the former is withdrawn. State v. Tapack, 78 N. J. Law, 208, 210, 211, 72 A. 962; Rice v. Olin, 79 Pa. 391; Murray v. Commonwealth, 79 Pa. 311; Commonwealth v. Molten, 230 Pa. 399, 407, 79 A. 638; Drossos v. United States, 2 F. (2d) 538 (C. C. A. 8); Mills v. United States, 164 U. S. 644, 649, 17 S. Ct. 210, 41 L. Ed. 584.

The time when the allotment had to be made to be effective was important in this case. Paul C. Dunlevy testified that he was director and vice president of the Miller Company and the defendant was the president of the Point Company, and that at the first meeting, September 13, 1928, when negotiations began for the sale of the patents, there were present "nobody but Mr. Nicola and myself representing both the Point Improvement Company and the Miller Printing Company." Dunlevy was not connected with the Point Company and so did not represent it. He represented the Miller Company. This left only the defendant to represent the Point Company. This would indicate that at the first meeting, when negotiations first began for the sale of the patents, allotment had been made to the Point Company, otherwise it had no place or business at that meeting, and the undisputed testimony is that it was represented there.

Again just as soon as the sale was completed and the commission earned, on that very day, it was credited to the Point Company. This fact is unquestioned and shows that allotment had been made when the sale was consummated. This follows as a necessary inference from what they did, though there is no writing expressly making the allotment and there does not have to be.

If the allotment had to be made at the time the negotiations leading up to the sale first began or when the transaction was completed, the sale effected and the commission was earned, as the court charged, there was evidence from which the jury could find that it had been made at either of those times. The jury was confused as shown by its returning twice to ask for specific instructions on this very point. Which of these instructions was right, as to the exact time the allotment had to be made, prior to the inception of the transaction, at the inception, or before the transaction was completed, and the commission was earned, the jury did not know.

The allotment in order to be effective had to be made by the time negotiations for the sale of the patents actually began. The fact that the commission was not actually entered in the books of the Point Company until December 31, 1928, is without significance for the evidence is uncontradicted that the allotment had long been made before then, and the diligence or lack of diligence of the employees of the Point Company in making the entry in this case has no bearing upon the guilt or innocence of the defendant.

2. He further says that this instruction was erroneous because it shifted the burden of proof.

Before the jury could find the defendant guilty, the government had to establish beyond a reasonable doubt that the defendant had not made the allotment when the negotiations for the sale actually began. The defendant did not have to prove himself innocent by showing that he had made the allotment. He could stand mute until the government had established his failure thus to make the allotment beyond a reasonable doubt. But the effect of the charge was that unless he affirmatively established that he had made the allotment to the Point Company at some one of the times mentioned, the jury could find that he had not made it and so was guilty. This placed upon him a burden which the law does not compel him to bear and was not cured by the instruction in the beginning of the charge that the defendant was presumed to be innocent until proved to be guilty beyond a reasonable doubt. The court should have charged that before the jury could find the defendant guilty, the government had to establish beyond a reasonable doubt that he had not made the allotment when the negotiations for the sale actually began. It charged the reverse and thus placed an illegal burden on the defendant. This was prejudicial.

It follows that the judgment must be reversed and a new trial granted.