## MEYERS v. UNITED STATES.

### No. 10325.

Circuit Court of Appeals, Ninth Circuit.

Feb. 19, 1945.

John W. Preston, of Los Angeles, Calif., and Bertil E. Johnson, of Tacoma, Wash., for appellant.

J. Charles Dennis, U. S. Atty., and G. D. Hile, Asst. U. S. Atty., both of Seattle, Wash., Harry Sager, Asst. U. S. Atty., of Tacoma, Wash., and John S. Swenson, Sp. Asst. to the Atty. Gen., of Seattle, Wash., for appellee.

Before GARRECHT, MATHEWS, and STEPHENS, Circuit Judges..

STEPHENS, Circuit Judge.

In 1938 appellant Meyers and eight others were indicted in ten counts for violation of the mail fraud statute, 18 U.S. C.A. § 338, in two counts for violations of the Securities Act of 1933, 15 U.S.C.A. § 77q(a) (1), and in one count for conspiracy to violate the mail fraud statute and the Securities Act, 18 U.S.C.A. § 88. The jury found guilty four of the defendants named in the indictment but disagreed as to Meyers.[1] On Meyers' retrial the jury

---

[1] Of the four defendants convicted, three appealed to this court which affirmed the judgment against them—Simons v. United States, 9 Cir., 1941, 119 F.2d 539.

returned a verdict of guilty under the ten counts charging mail fraud, not guilty under the two counts charging violations of the Securities Act, and not guilty under the count charging conspiracy. Judgment and sentence followed. Meyers appeals, complaining primarily of the admission of certain testimony into evidence by the trial court.

The indictment alleges that the nine named defendants, before using the mails as charged, "devised and intended to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations and promises from a class of persons whom they might induce to invest in one or more oil promotion enterprises in the States of Washington and California * * *." The fraudulent scheme is then detailed. Defendants procured the assignment to themselves and to corporations controlled by them of oil and gas leases covering approximately 135,000 acres of land in the State of Washington. They organized four corporations[2] through which they conducted a campaign inducing investors to buy fractional parts, or units, of the leases by means of false representations and promises with respect to their oil-producing enterprise. Large sums of money were collected.

According to the indictment defendants represented that they had come to the State of Washington to help develop its natural resources. They asserted that H. Harry Meyers, appellant, was a multi-millionaire and a shrewd businessman, that he was convinced of the potentialities of the Frenchman Hills district as an oil-bearing field, that he was completely financing the drilling of the first well, and that he was a principal in the firm of Joseph B. Strauss and associates of San Francisco, builders of the Golden Gate Bridge, and was entitled to chief credit for developing and executing the bridge enterprise. Defendants declared that units of oil leases were offered to Washington citizens only to create an oil consciousness among the people of that state and to make possible a successful fight against the great oil companies of California. They stated that the net proceeds from the sale of leases would be used to develop the Frenchman Hills and other districts in Washington and that at least six wells would be drilled. They

explained that defendant Broome was a highly successful geologist and petroleum engineer, was qualified to direct the drilling operations, and was convinced of the ultimate success of the Frenchman Hills project. They stated that drilling operations at Frenchman Hills had developed highly encouraging showings and prospects since a petroleum gas bearing formation had been encountered with gas rich in gasoline. They added that the Peoples Gas & Oil Development Company had an advisory board of excellent geologists and engineers. Late in 1935 they asserted that conditions at the well being drilled indicated oil before Christmas and that investors could depend upon receiving income before that day.

The indictment then alleges that the representations were deceptive, false, and fraudulent. It emphasizes that part of the fraudulent scheme was the making of false representations throughout the sales campaign by defendants and other officers and agents of the four corporations for the purpose of obtaining money from investors. Similar representations were allegedly made from time to time by defendants in speeches at open meetings with investors and prospects. In such addresses they assertedly admitted that an investment in an oil lease was speculative and not to be considered by one unable to take a chance, but that, since the proposition was so good, anyone who could take the chance "ought to have his head examined" for failing to do so.

An additional part of the scheme according to the indictment was the plan to sell the leases (originally acquired without cost), in units decreasing as to size and increasing as to price from time to time. The arbitrary boosts in price were supported by high-pressure sales methods. Over 30,000 people invested almost $3,000,-000 in fractional lease units and were later solicited and persuaded to exchange their holdings for shares of stock in the Peoples Gas & Oil Development Company.

The scheme also included, according to the indictment, the appropriation of large sums of money by defendants through various methods, the manipulation of the account books of the companies to conceal the true disposition of the sums collected, the eventual withdrawal of Meyers and his supposed funds from the enterprise and

---

[2] Peoples Gas and Oil Company, Peoples Gas and Oil Corporation, Peoples Gas and Oil Development Company, and Peoples Drillers, Inc.

the turning over of the directorships in the Development Company to investors, and an additional selling campaign of "Participations" in the Development Company ostensibly to drill additional wells. Nine counts of the indictment allege that certain letters were placed in the mails by defendants for the purpose of executing the scheme to defraud, and one count alleges that a certain publication was so placed in the mails. The dates on these communications range from December 4, 1935, to September 30, 1937.

At the trial of the case appellant Meyers' prominent position in the business world as revealed by his connections with Joseph B. Strauss and the Golden Gate Bridge project, and whether that position was truthfully represented by defendants in their campaign to sell interests, became one of the evidentiary issues. A great deal of testimony bearing on the subject was offered by both the government and appellant. Meyers had obtained contracts with Strauss under which the former was to act as the latter's agent in securing for the latter his appointment as engineer of the Golden Gate Bridge District. Meyers was to receive in return a percentage of Strauss' fee as chief engineer; the sum of $220,000 was later agreed upon as the gross amount due Meyers under the contracts. A large part of the sum was paid, but in 1934 a bitter enmity developed between Meyers and Strauss and litigation followed over a dispute as to the balance unpaid under the contract. The matter was not completely settled until after Strauss' death in 1938.

In attempting to prove that Meyers misrepresented the part he played in relation to the Golden Gate Bridge at San Francisco, the government was allowed to introduce a letter dated June 2, 1937, from Strauss to J. S. Swenson, Post Office Inspector. This letter will hereinafter be mentioned as Exhibit 98. We quote the letter in full in the margin.[3] The letter was admitted into evidence upon identifica-

3 " June 2, 1937.
"Mr. J. S. Swenson
"P. O. Inspector
"Post Office Department
"Seattle, Washington
"My dear Mr. Swenson:
"Your letter of March 27 has been received. I have had so much on my hands during these last months prior to the opening of the Golden Gate Bridge to traffic that it has been impossible for me to give attention to other matters.
"My connection with Meyers was an unpleasant experience which I have sought to put out of my mind. I have known him only since 1928. He had recommendations from General Goethals, whom I knew very well, and he was introduced to me at San Francisco. At that time he claimed to represent eastern capitalists, but I have no evidence as to this other than his own statement. He was then an applicant for a private franchise for a bridge from San Francisco to Oakland. Beyond that he had apparently no business interests. The man has a pleasing personality and is a glib talker and claimed intimate acquaintance with royalty and people of prominence abroad and in the United States, most of which, in my opinion, was purely talk. Later I was informed that his birthplace was a small town in Indiana, from which he ran away at the age of thirteen to join a circus and then engaged in a patent medicine business selling pills, which seemingly is responsible for the title of 'Doctor.' He never attended college and holds no degree of any kind, so far as I know.

"As respects the Golden Gate Bridge, my work on this project began in 1918.
"I did not meet Meyers until the latter part of 1928, by which time all the preliminary work on the project had been done. I had been appointed Engineer for the Citizens' Committee organized in 1923 to promote the project and was authorized in 1924 by the Counties of San Francisco and Marin jointly to apply for a War Department permit and prepare the necessary plans, had conducted the War Department hearing, served the Citizens' Committee in all its activities, acted as expert witness in all the litigation. As a result of these activities the District was formed in the month of December, 1928.
"By that time the opposition had intensified to the extent that they had organized a wide-spread campaign against the bridge project and myself, using every means in their power to defeat the project. Meyers, who happened to be in San Francisco in connection with certain promotional activities on a bridge to Oakland, persuaded me that he could be of great assistance as public relations counsel in off-setting the hostile propaganda, in molding public opinion and in helping the bond issue campaign in general. By reason of what I had been told and the recommendation by General Goethals, I accepted these statements at face value. That I was misled, later developments showed.
"The nature of his employment by me was on a contingent basis. Had he capably performed the promised services, there is no doubt but that the compensation orig-

tion of Strauss' signature by government witness Sparks, one of Strauss' old employees, and over appellant's objection that it was incompetent and hearsay. Strauss himself had died before the trial. Appellant then moved to strike the exhibit, and moved for a mistrial; later he assigned as error its admission into evidence.

■ Some small parts of Exhibit 98 may be said to be hearsay evidence, but in the main it is not evidence at all. It is an ill-tempered outpouring of bile written to the post office inspector who was marshalling evidence in support of criminal proceedings against Meyers. A large part of the exhibit is both wholly immaterial and wholly incompetent. That part of it which can with any propriety be termed evidence at all is clearly hearsay and inadmissible as such, and it is highly prejudicial. There is no exception to the general rule governing hearsay evidence which could justify its introduction as a whole. 5 Wigmore on Evidence, 3rd Ed., 3, § 1361; Lewellyn v. Electric Reduction Co., 1927, 275 U.S. 243, 247, 48 S.Ct. 63, 72 L.

Ed. 262; Donnelly v. United States, 1913, 228 U.S. 243, 273, 33 S.Ct. 449, 57 L.Ed. 820, Ann.Cas.1913E, 710; Lucas v. United States, 1896, 163 U.S. 612, 617, 16 S.Ct. 1168, 41 L.Ed. 282.

Contrary to the government's contention, Exhibit 98 is not against the writer's interest. Therefore, it cannot be considered properly admitted under the theory that it is an expression against interest and that it would not have been written had the contents not been true. See 5 Wigmore on Evidence, 3d Ed., 259, § 1455; Halleck v. Hartford Acc. & I. Co., 5 Cir., 1935, 75 F. 2d 800, 802; Citizens' Nat. Bank of Los Angeles v. Santa Rita Hotel Co., 9 Cir., 1927, 22 F.2d 524.

■ The government argues that Exhibit 98 was properly admitted on rebuttal since on cross-examination of a government witness a large number of Strauss' letters were admitted over the government's objection for the purpose of showing an intimate relationship between Meyers and Strauss.

---

inally agreed upon, while considerable, would have been justified by the character of the project and its magnitude and uncertainties. Under my arrangement with him, assuming my retention as Engineer and the successful promotion of the project, there was to become due him, according to his estimate, a sum total of $220,000. This computation was objected to by me at the time but because of the distance I had gone in the development plans and my desire for harmony, I accepted the estimate. Since then, and in view of the revelation to me of the falsity of his representations and his failure to comply with some of his promises, and his inability and failure to render services, I entered into litigation over payments becoming due. On the advice of my counsel, the litigation was settled and compromised and an agreement of settlement signed. At the time, Meyers was paid $15,000, and if he complied with the terms of said agreement, an additional sum of about twice that much is yet to be paid.

"If what you tell me concerning his recent misrepresentation is correct, then Meyers has breached the settlement agreement. I am now investigating that feature and I shall appreciate your assistance in discovering the facts.

"Meyers never had any contact with the Bridge District. He is in no way responsible for the conception of the project, its development, its financing or its consummation. Meyers was to offset the opposi-

tion against myself personally and my arrangement with him had nothing to do with the project proper. The opposition had tried to prevent my appointment as Engineer and had made me the target for attack.

"The Golden Gate Bridge was conceived, developed and carried through by me, and until 1929, when I was appointed Chief Engineer, I received no compensation whatever and paid all costs myself, and what I have received since then will be scarcely sufficient to enable me to break even. In my opinion, Meyers did notthing for the bridge except to hurt it, and one of the reasons for many difficulties I have had to contend with, is the association that I entered into with Meyers.

"Meyers at no time had any connection, real or imaginary, with the Strauss Engineering Corporation or with Strauss & Paine, Inc. At no time that I have known him has he been possessed of any means. On the contrary, he was continually claiming to be in need of money, and it was on this basis he succeeded in extracting from me much of the money that he collected.

"Meyers had the habit of painting rosy pictures of his contracts, his influence and the large amounts due him from various people and his ability to close up and secure business, none of which, in my opinion, had any foundation in fact.

"Yours very truly,
"JBS-m                Joseph B. Strauss"

In overruling a motion for a new trial, the trial judge stated that he allowed the introduction of Strauss' letters by defendant upon his determination to permit very liberal cross-examination because appellant in his opening statement asserted a close relationship between himself and. Strauss. Since some of the documents offered by appellant were very intimate in character and since Strauss was not able to refute their contents, the court was of the opinion that "to have allowed the record to stand in that position with the defendant [appellant herein] having made it, would have created a situation, as far as the triers of the facts were concerned, that would have compelled them to resolve the allegation in the indictment that there was an intimate and close relationship between Strauss and the defendant, and that the defendant was one of the major characters in the construction of the Golden Gate bridge." Therefore, the court concluded, it had acted within its discretion in admitting Exhibit 98, for otherwise the record would have presented only one side of the story. The government reasons in accord with the trial court that unfair prejudice would have resulted to the government had Exhibit 98 not been accepted into evidence.

It is true that in the interests of fairness, for the purpose of refuting evidence offered by an adverse party and of eliminating an unfair prejudice stemming therefrom, evidence otherwise inadmissible has had the approval of courts. Jones on Evidence, 2d Ed., 192-3, § 172; 1 Wigmore on Evidence, 3d Ed., 304-7, § 15; Bogk v. Gassert, 1893, 149 U.S. 17, 25, 13 S.Ct. 738, 37 L.Ed. 631; Bradley v. Adams Express Co., 6 Cir., 1937, 89 F.2d 641, 642; Gin Bock Sing v. United States, 9 Cir., 1925, 8 F.2d 976, 978. However, Exhibit 98 was not written contemporaneously with the letters introduced by the defendant-appellant or while Meyers and Strauss were in association and does not assist in the proper understanding of letters written during such association. Therefore, it does not serve the stated purpose. Furthermore, only in the most prejudicial manner, through the broadest of hearsay, and by unsupported statements does Exhibit 98 refer to the relations that existed between these men in their association. We cannot but conclude that the document was improperly admitted into evidence.

It is claimed by the government that all matters in Exhibit 98 were otherwise established in the case and therefore that, in any event, its admission did not prejudice appellant, but its prejudicial character is unmistakable on its face. We have noted the trial court's opinion that in the absence of Exhibit 98 the triers of fact would have been compelled to find an intimate relationship between Strauss and appellant. Since the jury reached a verdict of guilty, it is quite within reason to contend that without the questioned exhibit the verdict would have been different.[4] The introduction of the letter (Exhibit 98) was prejudicial to the rights of appellant, and the judgment must be reversed. Nicola v. United States, 3 Cir., 1934, 72 F.2d 780, 783.

Reversed and remanded.

---

4 Appellate mentions in his brief that Exhibit 98 was not introduced against him at his first trial in which the jury disagreed, a fact indicating that the exhibit might have had a significant influence on the minds of the jurors at the second trial.