**Edwin H. EGGLETON, Jr.,**
**Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 12366.**

United States Court of Appeals
Sixth Circuit.

Dec. 3, 1955.

Before ALLEN, McALLISTER, and STEWART, Circuit Judges.

McALLISTER, Circuit Judge.

Appellant was convicted of violation of the income tax law and seeks review, claiming, first, that his business records were obtained from him by the government in violation of his constitutional rights; that the trial court erred in denying his motion for a bill of particulars, and in permitting the introduction in evidence of certain exhibits; and that the trial court further erred in denying his motion for judgment of acquittal and in the instructions to the jury.

A review of the testimony of appellant and other witnesses discloses that he voluntarily, and repeatedly, turned over his records to the government agent and thereby waived any right to complain of illegality. Nicola v. United States, 3 Cir., 72 F.2d 780; Hanson v. United States, 8 Cir., 186 F.2d 61. On the issue whether the trial court erred in declining to grant appellant's motion for a bill of particulars, this is a matter within the discretion of the court and its determination is only to be set aside for an abuse of discretion. Appellant was asking, in his demand for a bill of particulars, for information based upon his own books and for matters peculiarly within his personal knowledge. The evidence shows that numerous conferences were held prior to the commencement of the present case which were attended by appellant, his counsel, and Internal Revenue agents, at which many matters relating to the case were discussed and analyzed over a long period of time. In the light of the testimony and under these circumstances, we cannot say that appellant was so surprised or misled that the trial court abused its discretion in denying his motion for a bill of particulars. United States v. Skidmore, 7 Cir., 123 F.2d 604; Maxfield v. United States, 9 Cir., 152 F.2d 593; Stumbo v. United States, 6 Cir., 90 F.2d 828.

Appellant was engaged in the purchase and sale of secondhand automobiles. When a dealer purchases secondhand cars

Louis E. Ackerson, Louisville, Ky. (Fred J. Karem, Louisville, Ky., on the brief), for appellant.

Charles M. Allen, Asst. U. S. Atty., Louisville, Ky. (J. Leonard Walker, U. S. Atty., Rhodes Bratcher, Asst. U. S. Atty., Louisville, Ky., on the brief), for appellee.

for resale, it is necessary, in many cases, to expend money for labor and parts to repair, paint, and place them in salable condition. The dealer's costs attributable to a car that is resold, therefore, include the price paid for it—or allowed for it in exchange—and the costs of repairing, painting, and placing it in a suitable condition for resale. These costs can either be allocated, on the books, to each car sold for which such costs are incurred, or totaled for the year as the aggregate costs and expenses incurred in selling such cars. Such costs are, of course, deductible in income tax returns as expenses.

In this case, appellant, in his income tax return for 1947, had claimed as a deduction for the aggregate costs of repairs and automobile parts, the sum of $9,677.67. The government, however, found, in an examination of his books, that in numerous cases, appellant had set forth as the cost to him of secondhand cars which he had purchased, sums largely in excess of what he had actually paid for such cars. Sums set forth as the cost of cars by secondhand dealers could, as above mentioned, represent expenses in repairing and reconditioning them for resale. But such expenses obviously cannot be claimed for each car sold and also claimed in the aggregate of expenses totaled for the year. The government proofs show that the amounts set forth by appellant as costs of secondhand cars, in excess of what he actually paid, aggregated $19,892.42, and, consequently, that, in this regard, he had understated his income by that amount.

Evidence introduced on behalf of appellant was to the effect that from 1945 through 1947, automobiles were still scarce because of the prior curtailment of production for civilian use during the war; that during that period, it was a common practice for dealers in secondhand cars to pay a "locator's fee" to anyone who would report to a dealer where a car could be obtained; and that such a fee would be between $25.00 and $50.00 a car. Such fees were also called bird dog fees; and one of the witnesses testified that during the years he had worked for appellant in 1946, 1947, and 1948, he had seen him pay numerous bird dog fees both for buying and for selling cars. Appellant's bookkeeper testified that in 1947, appellant carried a large amount of cash with him at all times and was himself solely in charge of the purchasing of cars; that it was an established custom to pay out locator's fees; that often appellant, after exhausting his cash for various expenses in the business, would ask the bookkeeper for additional cash; that no one other than appellant paid any of the expenses or bills or locator's fees; that the bookkeeper knew what the initial cost of a car was but had no way of knowing its ultimate cost except as he would learn it from appellant; that the returns were submitted to appellant who told the bookkeeper what additional cost was involved, which appellant had theretofore paid in cash; and that the ultimate cost of the car, as it appeared on the books, included the initial cost and the "extra cost that went on that car," consisting, among other items—not itemized on the books—of locator's fees and similar commissions. In sum, appellant's bookkeeper stated that, upon consultation with appellant, he added to the initial cost of the individual automobiles, on records which he prepared, the additional costs for commissions, locator's fees, and repair parts that resulted in bringing the total set forth as the cost of the automobile on the books, above the amount of the initial cost of obtaining it. An accountant testifying on behalf of appellant stated that an analysis of appellant's books and his net worth, disclosed $19,732.46 "cash available" in the business; that if this amount of cash had not been used for expenses in the business, "it would show up," but that it did not appear in either a net worth statement prepared by the government, or a net worth statement submitted by appellant. From this, the accountant insisted that such sum of $19,732.46 must have been expended by appellant in cash for costs of the vehicles in addition to the initial cost of the cars

and the total costs deducted on the income tax return for repairs and parts. It is to be said, however, that such cash could have been diverted to appellant's own purposes and secretly retained by him.

Appellant argues that he paid cash in the amount of such claimed excess costs to repairmen and dealers in automobile parts and supplies and painting establishments in order to place such cars in salable condition, as well as locator's fees and commissions, and that the amount of $9,677.67 claimed by him as a deduction for such costs should be increased an additional amount of $19,892.42 which it is claimed he disbursed for such purposes. There is, however, no substantial or valid proof to sustain this claim. There are in existence no checks, receipts, invoices, records, or book entries, either of appellant himself or of repair or supply men to whom, as he claims, he made such payments, or of anyone to whom he claims he paid such fees. Several dealers in parts and supplies were called as witnesses by appellant. None was able to testify as to any such payments from him for the period in question.

It is contended that since the evidence showed that appellant's average deductions of $60.11 on each automobile resold by him in 1948 were not questioned by the government, it should follow, without question, that he spent at least that much on each car sold by him in 1947, the year here in question, instead of $21.50, which would be the amount per car on the aggregate expense of $9,677.-67, which appellant had claimed that year as a deduction in his income tax return. Appellant's accountant insisted that if the additional amount of $19,732.46 claimed to have been expended, in 1947, as costs by appellant had been represented by canceled checks, the government would have found no complaint with such an item of expense, presumably for the reason that this would have amounted to the same proportionate cost per car that was conceded to be the cost per car to appellant in 1948. But this was a matter for argument before the jury, as the

district judge several times observed during the course of the trial, especially when counsel for appellant repeatedly sought to introduce an exhibit in evidence on the basis of the assumption that what had happened in 1948 with respect to appellant's costs of cars for resale must also have happened in 1947.

The jury certainly understood and considered appellant's contention in this regard. However, it also had before it appellant's income tax return in which $9,677.67 was expressly set forth and claimed as the deduction for costs of repairs and parts in 1947, as well as proof that, on his books, appellant showed as costs for each of the cars in question sums in excess of what he had paid for them. This could indicate that he was claiming as a deduction such costs on the sale of each car, and also the aggregate costs for all cars sold during the year, or that he was concealing income in the form of profits on each car. Also, many cars were resold by appellant on the same day on which they were purchased by him, at an increase in price. But the increase of price did not show on his books. The jury could conclude that these were items of profit omitted from reported income in the tax return. Moreover, the fact that no witness testified that he had received any locator's commissions or bird dog fees during the year 1947, and that neither appellant nor his bookkeeper could testify as to any persons receiving such fees during that year—or any cash for costs in addition to the amount claimed in his income tax return as a deduction by appellant for that year—may have had weight with the jury. Whether appellant overstated his expenses and thereby understated his income was a question of fact for the jury.

Many claims of error are advanced by able and assiduous counsel for appellant in their copious briefs of approximately 180 pages, including, in the principal brief, a statement of eleven questions involved in the appeal, subdivided in argument into twenty-one separate headings, and eleven counter-statements in the re-

ply brief. It would be difficult, within a reasonable space, to discuss these seriatim and it is not, in any event, necessary to a determination of this appeal, inasmuch as many of these points become irrelevant in view of our disposition of the principal issues.

In proving its case, the government prepared a schedule which was introduced in evidence over appellant's objection, showing the names and addresses of persons or firms from whom the cars were purchased, the dates thereof, the descriptions of the cars—year, make, motor number—, cost or trade-in allowance, and purchase date. The items in this schedule were based upon the testimony of witnesses and on the books and records of appellant. The schedule disclosed the sale number, the person from whom the car was obtained, the cost of the vehicle—and the excess cost claimed by the government—for 202 cars, aggregating the sum of $19,892.42 more than the actual cost to appellant.

Appellant claims error in the admission of the above mentioned schedule in evidence, one of his objections being that certain of the items taken from the books disclosed mistakes in the schedule. These errors, however, were rectified in the course of the trial; and, since it was based on records and testimony, we find no error in the admission of the schedule in evidence.

Appellant also claims error in the introduction in evidence on behalf of the government of a net worth statement which the trial court admitted for the purpose of corroborating the proof as to the specific items upon which the government relied. This was not a so-called net worth case and there was not on the part of the appellant the usual objection to the use of a net worth statement— that it failed to show an "opening net worth" with sufficient proof and certainty. Here, the principal objection was that the net worth statement did not take into consideration and reflect certain errors in the records that negatived willfulness on the part of appellant in understating his income. Appellant, however, could controvert the evidence of net income as disclosed by the net worth statement by testimony and proof in showing errors on the part of his bookkeeper or himself that would negative his guilt. It appears, however, that even though the jury believed appellant or his witnesses as to various erroneous items, there would still remain substantial income that the jury could find was unreported. As to appellant's additional contention that the net worth statement was erroneously admitted since his books were adequate to reflect his income, this did not appear to be the case. The books did not reflect the amount of overstated costs of the vehicles purchased for resale in the amount of $19,892.42 for they did not show what appellant paid for them. Furthermore, the testimony of appellant's accountant disclosed many unreported sales of cars that never appeared on his books aggregating a profit of $4,252.55, as well as a substantial amount of income from financing cars.

As mentioned above, this was not a so-called "net worth case." The government relied upon proof of specific items of unreported income. It ascertained and proved from sources outside appellant's books and records what he had actually paid for a large number of automobiles for resale in 1947. It then showed from his books what he had entered as the costs of these cars, and it further showed, from such computations, that he had overstated these costs by $19,892.42. From these figures, the government claimed that appellant's overstatement of the costs to himself resulted in understating the sales price of the automobiles sold, which, when reflected on his income tax returns, showed an omission of income.

■■ The net worth statement, indicating unreported income of $29,268.86, was introduced to corroborate the government's proofs on the trial of specific items of unreported income—and, in fact, a large amount of unreported income is admitted by appellant. Of course, he claims that, in this regard, the

evidence negatives his willfulness in failing to report such income. This contention, however, presented a question for the jury; and it cannot be said that the admission of the net worth statement, under the foregoing circumstances, resulted in prejudicial error.

 In sum, the government relied principally on the claim that appellant showed on his books costs of cars for resale in excess of what such expense actually was, to a total of $19,892.42. Appellant maintained and testified that he actually paid out that amount for parts and repairs to place the cars in salable condition. He had nothing to show, however, to prove such payment and could, not establish it by the testimony of anyone receiving any such amount or any part thereof. To emphasize this absence of proof, the government pointed out that appellant had specifically made a lump sum claim for such costs of repairs and parts as a business expense deduction in his income tax return in the amount of $9,677.67; that he could not claim such costs for each car as well as claim them in a lump sum; that, since he had made a lump sum deduction for such costs in his income tax return, it was incredible that during the same year, he had also paid out cash for the same costs in such a large amount for the same purpose, especially as there was no evidence whatever of such cash expenditures in his records or from any other source than his own testimony.

On the other hand, in brief, the substance of appellant's claim is that the evidence, taken as a whole, proves that he actually disbursed $19,892.42 in cash for parts and repairs to place the cars in salable condition and for necessary locator's fees and commissions, regardless of the fact that this claim rests solely upon his own testimony. He submits that since his conceded costs for repairs and parts and fees in the year 1948 amounted to an average cost of $60.11 per car, it is unbelievable that his similar costs for 1947 amounted to only $21.50 per car; and that if he were allowed as a proper deduction the amount of $19,-892.42 which he claimed he disbursed in cash in 1947, in addition to the sum of $9,677.67 which he claimed as a deduction for such costs in his income tax return for that year, his total costs for parts and repairs of $29,570.09 would amount to an average of $63.94 per car in 1947, as compared with $60.11 per car in 1948. This argument, taken by itself, is persuasive; but is not conclusive. We cannot say that a verdict based on appellant's overstatement of such costs, and consequent understatement of income for the year 1947, is not sustained by the evidence.

Other matters argued in the briefs have been considered but, in our opinion, are, in view of our determination, without substance or unnecessary to decision.

The judgment of the district court is affirmed.