**William EPSTEIN, Appellant,**

v.

**UNITED STATES of America,** Appellee.

**No. 13034.**

United States Court of Appeals Sixth Circuit.

July 2, 1957.

Hal Gerber, Memphis, Tenn., William Gerber, Eugene Bernstein, Memphis, Tenn., on brief, for appellant.

Millsaps Fitzhugh, Memphis, Tenn., Edward N. Vaden and Warner Hodges, Memphis, Tenn., Charles K. Rice, Asst. Atty. Gen., on brief, for appellee.

Before ALLEN, McALLISTER and STEWART, Circuit Judges.

ALLEN, Circuit Judge.

Defendant[1] was convicted in jury trial on all four counts of an indictment charging willful evasion of income taxes for the years 1949, 1950, 1951, and 1952. The indictment charged that defendant under-reported his income in 1949 in the amount of $40,527.62; in 1950 in the amount of $29,216.09; in 1951 in the amount of $52,799.25; and in 1952 in the amount of $24,397.29, or a total for the four years of $146,940.25.

During all of the period in question and for over 30 years previously defendant had operated a pawnship and a store in Memphis, Tennessee. Up to January, 1949, he kept his own books in the pawnshop business. Thereafter he delegated this task to professional bookkeepers. While defendant's counsel claims that the evidence is "overwhelming" that defendant's books were adequate, the testimony of his own witnesses indicated that they were not adequate. After January, 1949, the books were posted by one Leonard Weis, defendant's witness, who made up periodical statements from memoranda received from defendant and his wife, which Weis said he was given "once a month * * * to put on the books." While Weis computed purchases from checks, the loans were paid out of cash and the memoranda were the only record Weis had as to the loans. A similar system where the books of a business were merely a computation of slips from the totals of a cash register which had no tapes was held by the Tax Court of the United States not to correctly reflect the taxpayer's income and this court affirmed that holding in Kurnick v. Commissioner of Internal Revenue, 6 Cir., 232 F.2d 678, 680.

Defendant's income tax returns from 1945 on were prepared by W. C. Summers, defendant's witness, a bookkeeper attached to the accounting firm of Homer K. Jones & Company. Summers prepared the income tax returns partly from records made by Weis and from information furnished to Summers by defendant and his wife. This system of making up income tax returns of income derived from extensive business operations based on oral statements or monthly memoranda is subject to the same criticism as the manner of posting the books by Weis.

Summers stated that he made "No verification in any way" and put on the return whatever they told him. Summers told defendant that there should be a "better system" and suggested that defendant keep more accurate records and that defendant have Summers's accounting firm "set up a good set of books." This advice was not followed.

An agent of the Internal Revenue Service who examined defendant's books testified that most of defendant's expenses "were paid by cash" and he knew of no way to check the books. He testified, "I feel that the figures on the books are not correct." Summers stated to Norris, Special Agent with the Intelligence Division of the Internal Revenue Service, that there was no way "to verify sales" from these books and that no one could "verify expenditures made in currency." This being the case, the Commissioner was authorized under the regulations and statute to compute petitioner's income in a way that would clearly reflect his income. The net worth method was employed. Defendant's tax accountant, Homer Jones,

---

[1]. The appellant will be denominated as in the court below.

agreed that this was the proper method in view of the condition of the books.

■ Defendant contends that because defendant kept books and no specific false entries were shown, the net worth method of proof is not applicable. However, Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150, which affirmed a conviction for fraudulent evasion of income tax computed under the net worth method, decides this point squarely in favor of the Government. In the Holland case the conviction was attacked upon the specific ground that the Government was unable to point out any false entries. The Supreme Court stated: "Nevertheless, if we believe the Government's evidence, as the jury did, we must conclude that the defendants' books were more consistent than truthful, and that many items of income had disappeared before they had even reached the recording stage." Holland v. United States, supra, 348 U.S. 132, 75 S.Ct. 133.

The net worth method as used by Norris employed many items of independent evidence such as defendant's income tax returns as to merchandise and inventory, bank statements furnished by defendant, cancelled checks, and other bank records as well as testimony from numerous witnesses as to the purchase by defendant or from defendant of valuable pieces of land and amounts paid for them during the years in question.

■■ The court did not err in overruling defendant's motion for acquittal. While the evidence was in controversy the government, through many witnesses and exhibits, presented evidence of substantial understatement of income for each of the taxable years. The Government also presented evidence of the existence of a current tax source, namely, income from the pawnbroker business, the store, and substantial income from other sources. The consistent understatement of large amounts of income for a number of years is evidence of willful intent to evade. Kurnick v. Commissioner, supra, 232 F.2d 681; Drieborg v. Commissioner of Internal Revenue, 6 Cir., 225 F.2d 216. In Holland v. United States, supra, 348 U.S. 139, 75 S.Ct. 137, the Supreme Court declared that "evidence of a consistent pattern of underreporting large amounts of income" will support "an inference of willfulness."

Norris's computation as to assets and liabilities for the years under indictment, other than cash, he testified were almost identical with the figures calculated for the same items by Homer Jones, head of Summers's accounting firm prior to the early summer of 1955. This was not denied. It was shown that defendant's total expenditures during the taxable years over and above the cost of operating his business were $368,951.85. The total net income reported by defendant during that time was $88,170.19.[2]

These calculations, which the jury evidently believed, showed that defendant's private expenditures exceeded his total available income and entitled the jury to find that defendant had large unreported income. Exhibit 11 Norris showed the total income of Epstein (1920 to 1948) per filing record was $320,848.50; of Pearl Epstein (1937 to 1948), $35,138.18; of J. P. Kirschner (1937 to 1948), $128,977.98; total for these three people, $484,964.66. The total expenditures as shown by the same exhibit, during the same period, were $514,010.90. Similar circumstances were held in United States v. Johnson, 319 U.S. 503, 517, 63 S.Ct. 1233, 87 L.Ed. 1546, cited with approval in Holland v. United States,

2. The itemized expenditures as figured by Norris are as follows:

| 1949–1952 | |
| --- | --- |
| Business Investments | $127,464.65 |
| Real Estate | 106,966.93 |
| Living Expenses | 49,869.54 |
| Federal Income Tax | 22,900.17 |
| Life Insurance | 9,448.84 |
| Stocks & Bonds | 18,139.53 |
| Servants' Salary | 10,411.00 |
| Automobiles | 5,183.43 |
| Increase Bank Balance | 7,850.45 |
| Paid Loans, etc. | 9,757.95 |
| Capital Loss | 959.56 |
| Total | $368,951.85 |

supra, 138, to support the finding that defendant in that case had some unreported income which was properly attributable to his earnings. When questioned by Norris, defendant herein declared that there were no nontaxable sources for large net worth increases such as gifts, loans, or inheritances. Cf. Holland v. United States, supra, 348 U.S. 137, 75 S.Ct. 136. The important leads particularly stressed in the Holland case were lacking. Moreover, the jury could reasonably find from this record of exhaustive investigation that a likely source of net worth increase existed in the pawnbroker's business and the Kirschner business with their many cash transactions.

A crucial point of the controversy is the Government's calculation of net worth as of December 31, 1948. The Government figured net worth for that year at $246,839.63 and the increase in net worth for that year as $36,004.-18. Corresponding figures for 1949 are $299,437.25 net worth, $52,597.62 increase in net worth; for 1950, $347,-247.16 net worth, $47,809.91 increase in net worth; for 1951, $385.694.21 net worth, $38,447.05 increase in net worth; for 1952, $403,264.87 net worth, $17,570.66 increase in net worth. The corrected net income calculated for the years 1949, 1950, 1951 and 1952 was $60,633.24, $66,358.55, $69,325.84 and $38,792.41, respectively. The figure for net income reported by defendant for 1949 was $20,105.62; for 1950, $37,-142.46; for 1951, $16,526.59; for 1952, $14,395.12. The Government figured that the net income not reported for the taxable years was as follows:

| | |
|---|---|
| 1949 | $40,527.62 |
| 1950 | 29,216.09 |
| 1951 | 52,799.25 |
| 1952 | 24,397.29 |

Defendant in a statement introduced in evidence calculated a much larger amount than the Government figure for the net worth of the taxable years. For December 31, 1948, defendant calculated $356,695.47; for 1949, $389,508.15; for 1950, $408,852.75; for 1951, $403,261.-66; for 1952, $400,630.43. This made the increases in net worth for the taxable years much smaller than those of the Government's calculation so that the income computed in defendant's statement tallied very closely with the net income reported by defendant in his income tax returns.

The opening net worth calculated by the Government for December 31, 1948, was $246,839.63 and by defendant the same figure was calculated as $356,695.-47.

Except for cash on hand and in the bank, the assets given by Norris, the Government witness, in the Condensed Net Worth Determination (Exhibit 5 to Norris) were the same assets listed in Exhibit 1 to Deutsch, the calculation of a net worth statement for defendant and his wife made by defendant's expert witness and the valuation set was the same in each calculation. The Norris statement for 1948 gives cash on hand $20,000 and cash in bank $6,183.51. The defendant's statement gives cash on hand $20,000; Mrs. Pearl Epstein $27,116.02; and J. P. Kirschner Accumulation $82,-739.82. The principal difference in the ultimate calculation arises from the inclusion of the last two items in defendant's statement. Norris took his figure from defendant's own statements made not only to him but to Dun & Bradstreet and to a bank. Defendant said that he took his figure from his own cash as figured by Norris, that of his wife and the accumulation of net income from the Kirschner store, all of which, he said, was kept in an open safe in his pawnbroker shop, the only safe in the shop. The figure of $27,116.02 for Mrs. Epstein was later raised to $63,000.

Several witnesses for defendant, including a police commissioner and a police chief, testified that they had seen large amounts of money in the safe. The police chief had seen $100 bills taken from it. Defendant stated to the Internal Revenue agent that no one except his wife and son knew the amount

of cash in it. Mrs. Epstein did not testify, but her affidavit received in evidence said that she knew of her own knowledge that large amounts of cash, including the Kirschner accumulation, were kept in the safe. The son did not testify on this point. Defendant did not take the stand.

Defendant had made many statements contradictory to his claim first asserted to Norris in 1955 that he had a cash balance of $168,000 in his safe on December 31, 1948. During the course of the Government investigation he at first stated to Treasury Investigator Norris that he had $6,000 to $8,000 cash in his safe. Later he stated to Norris that he had $22,000 in cash in the same vault at the beginning of 1948. On June 21, 1955, this cash amount was increased by defendant's attorneys to $168,000. Beginning with 1937 defendant had given a number of voluntary reports to Dun & Bradstreet. The Dun & Bradstreet report of 1945 lists cash on hand and in the banks in the sum of $20,000 and lists the same amount in 1946. The amount defendant reported for cash on hand in March, 1947, was $15,000.

Defendant also made signed statements to the Union Planters National Bank of Memphis for the purpose of procuring and maintaining credit. One of these stated that he had "cash on hand and in bank $20,000" on February 2, 1945, another that he had "cash on hand $17,500 and cash in bank $3,600" on December 31, 1949.

The facts as to the Kirschner store for which defendant lists an accumulation of $82,739.82 as part of his cash on hand December 31, 1948, present further substantial contradictions. This store belonged to defendant prior to 1937. It was located in the same building as the pawnbroker shop and the two concerns had a connecting door. On May 20, 1937, the Tennessee Legislature passed an act, Chapter 185, Public Laws of 1937, forbidding pawnbrokers to carry on any other business or vocation, directly or indirectly, in the same building or in any other building adjoining the place of business and also forbidding anyone licensed as a pawnbroker from keeping more than one house, shop, or place for such business of pawnbroker. Defendant in an affidavit received in evidence declared that because of this enactment his counsel advised him "to transfer my merchandise inventory to J. P. Kirschner and the J. P. Kirschner store was operated at 162–164 Beale, while my pawnshop was operated at 166 Beale. * * *" Defendant's son testified that counsel advised defendant to seal the opening between the two stores and to place the sales store in the name of "a trusted relative, and * * * make two separate establishments * * * and * * * to keep separate books, separate records, and file all separate tax returns on that basis." In an interview with Norris, defendant said that he separated these stores upon the advice of an attorney, who counseled him to "file returns in the name of Kirschner." Norris testified that defendant said "he figured out the using of Kirschner's name in order to get around that in the law." Kirschner was defendant's father-in-law.

From 1937 to 1948 the income from the Kirschner store was returned separately and not included in defendant's income tax return. Section 17 of Chapter 185, Public Laws of 1937, was repealed in 1949, Pub.Laws 1949, c. 205, and after that the Kirschner store was dissolved, the inventory was taken over by defendant, and returns of income from the Kirschner store were made on defendant's tax returns.

Defendant's affidavit states that after the door was walled up between the pawnshop and the store in 1937, "my wife Pearl Epstein was employed as bookkeeper, while I practically managed the Kirschner store from 166 Beale as well as my own business. * * *" The affidavit also states that Kirschner received no salary or pay in any form from defendant during the years 1937 to 1949, but that J. P. Kirschner and his wife,

the latter until her death in 1942, and the former until his death in 1952, lived with defendant and paid no board.

The arrangement that a partition should be put between the two establishments, that the second business be put in the name of defendant's father-in-law with the license issued nominally to Kirschner, and that income tax returns be filed separately, all of which arrangement was carried out to the letter, indicates that the purpose of the transfer was not to change the location of the store. The location was not in fact changed. To move the store into another building if it had been done would not require the transfer to defendant's father-in-law. The shift in the conduct of the business of the store had two important results: (1) Defendant had only one pawnbroker business listed under his name and Sections 6 and 17 were thus apparently complied with; (2) There was a substantial reduction in income tax.

■ As to the item of $82,739.82 cash on hand from the Kirschner store defendant finds himself on the horn of a dilemma. If during the years in which the Kirschner income accumulated the store belonged to defendant he should have returned this income in his personal income tax. If the store belonged to Kirschner the income received did not belong to defendant and could not be figured in cash on hand as of December 31, 1948, in establishing net worth. Defendant did not explain this situation. The jury was entitled, if it found the store belonged to the defendant, to consider defendant's failure to return the yearly net income of the Kirschner store in his income tax return as evidence of substantial evasion. If the jury found the store belonged to Kirschner it was entitled to disregard the sum of $82,739.82 in the calculation of net worth.

■ The investigation conducted by Norris was not only thorough but fair. He held repeated and extensive conferences with defendant's attorneys and accountants and frankly stated to them the detailed basis for his various cal-

culations. The jury was entitled to consider the fact that the shift in defendant's position as to cash on hand, that he had $168,000 on December 31, 1948, was made after Norris had fully disclosed his accounting to defendant and his representatives.

Norris's estimates were based not only on the great quantity of documentary evidence mentioned above, but upon information obtained from numerous witnesses. The computation of personal expenditures was made on the basis of minimum expenditures. The estimates as to the value of defendant's real estate, stocks and bonds, and other property were based upon cost. With reference to the controversial point of cash on hand December 31, 1948, Norris went back to defendant's bank statement for December 31, 1946, showing cash on hand and in the bank of $21,740, which was the largest amount of cash on hand and in the bank shown on defendant's financial statements prior to the one for 1949. This was a financial advantage to defendant in the calculation of his net worth.

Whatever the precise grounds, the jury evidently did not believe defendant's story that he had, on December 31, 1948, $168,000 kept in his open safe.

Defendant makes numerous attacks upon the charge of the court, all of which have been considered. We deem it unnecessary to discuss these objections in detail. The charge, read in its full context, and considered from its four corners, is clear, complete, correct, and fair.

Defendant's contention that the court committed reversible error in refusing to give a requested charge that his statements to Dun & Bradstreet and the signed statements given to The Union Planters Bank were extrajudicial statements which within recent decisions of the Supreme Court required corroboration requires more extended comment. Defendant, relying principally upon Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192, not only contends that his statements to Norris require

corroboration, but also that his own statements made to private business concerns years before the controversy arose constitute extrajudicial statements which cannot be introduced in evidence unless they are corroborated by independent evidence. The Smith case, 348 U.S. 152, 153, 75 S.Ct. 197, held that the statement required to be corroborated is "suspect if it is extracted from one who is under the pressure of a police investigation * * *." The Supreme Court declared that extrajudicial admissions given during police investigation have something of the nature of a confession and that the accused may not be convicted upon such admissions if uncorroborated. The court held the corroboration requirement applies to mere admissions "at least where, as in this case, the admission is made after the fact to an official charged with investigating the possibility of wrongdoing, and the statement embraces an element vital to the Government's case." However, in a note, 348 U.S. at page 155, 75 S.Ct. 198, the Supreme Court also states that admissions given under special circumstances, providing grounds for a strong inference of responsibility, may not have to be corroborated. Miles v. United States, 103 U.S. 304, 311, 312, 26 L.Ed. 481; State v. Saltzman, 241 Iowa, 1373, 44 N.W.2d 24.

In United States v. Calderon, 348 U. S. 160, 165, 75 S.Ct. 186, 188, 99 L.Ed. 202, the court pointed out that the only evidence of defendant's fortunes between 1935 and 1946, the first prosecution year, consisted of his tax returns for 1944 and 1945 "and some meager evidence with regard to his tax returns for 1941, 1942 and 1943." The court said, "The latter apparently was obtained from the respondent, and, standing uncorroborated, cannot serve to corroborate respondent's other admissions."

The Dun & Bradstreet statements and the bank statements, relied on by both parties, are in an entirely different category from the statements made to Norris. They are not admissions although they shed light upon opening net worth.

■ They are not even declarations against interest; they were made for defendant's benefit. They constituted the best evidence under the general principle that a man's own acts, conduct, and declarations which were voluntary, are always admissible in evidence against him. United States v. Wood, 14 Pet. 430, 10 L.Ed. 527. They were in fact independent evidence admissible without corroboration. In themselves they strongly corroborated the extrajudicial statements made to Investigator Norris covering the years concerned. As the requested charge on this point linked the statements made before investigation together with the statements made in course of investigation, it was properly refused.

■ Five objections relate to the admission of charts embodying the calculations of the Treasury Department in detail. There was no error in the admission of these charts. They were presented in explanation of the net worth calculations. While the testimony concerning certain of the items was in controversy, evidence was presented which entitled the jury to believe that the charts were substantially accurate. They were shown to be based upon the evidence, defendant's numerous statements, oral and written, his cancelled checks, bank records, and oral testimony of disinterested witnesses. It has been repeatedly held by this court that such charts are admissible. Smith v. United States, 6 Cir., 239 F.2d 168, 169; Gariepy v. United States, 6 Cir., 189 F.2d 459. Cf. Eggleton v. United States, 6 Cir., 227 F.2d 493. The trial court in its charge left the jury "free to exercise its untrammeled judgment upon the worth and weight" of the evidence given in the charts. Smith v. United States, supra.

■ The contention that the court committed reversible error in permitting the admission of two letters signed by Eugene Bernstein in explanation of one of the charts has no merit. Bernstein was an accountant employed to represent defendant. During the course of the investigation he wrote one letter

(dated February 3, 1955), on the letterhead of his accountant's firm, with reference to the holdings of defendant and his wife. He wrote a similar letter on the letterhead of defendant's attorneys in which his name is listed as tax counsel, giving similar information with reference to the transactions between defendant and The Jameson Construction Company. These statements from attorney and tax counsel are plainly competent.

▆ Counsel for both parties failed to observe our rule as to preparation of briefs and appendices, Rule 16(e), 28 U.S.C.A. The Dun & Bradstreet reports and the bank statements particularly relied on were not printed in either appendix. Numerous items of testimony were referred to without page citations. This imposes an unnecessary burden on the court. Continued disregard of the rule in this respect may, in the future, call for reprimand, as well as an order postponing hearing and requiring reprinting of the appendices.

No reversible error appearing, the judgment of the District Court is affirmed.