ESTATE OF NICHOLAS G. HANNA, Deceased, GEORGE N. HANNA II, Administrator, C.T.A., and EDNA M. HANNA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Hanna v. Commissioner
Docket No. 3581-73
United States Tax Court
T.C. Memo 1976-32; 1976 Tax Ct. Memo LEXIS 374; 35 T.C.M. (CCH) 128; T.C.M. (RIA) 760032; February 4, 1976, Filed Arthur T. Ciccarello, for the petitioners. Rudolf L. Jansen, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in the Federal income *375 tax of Nicholas G. Hanna and Edna M. Hanna and additions to tax as follows: Additions to Tax
Year
Defieiency
[1] Sec. 6653(b) 1960
$ 848.25
$ 424.13
1961
6,852.65
3,426.33
1962
5,824.17
2,912.09
1963
9,971.60
4,985.80
1964
5,464.53
2,732.27
1965
5,358.93
2,679.47 Nicholas G. Hanna died after filing the petition herein and his estate has been substituted for him as a petitioner. For convenience, the decedent, Nicholas G. Hanna, will be referred to as petitioner. The issues for decision are whether petitioners understated their taxable income on their Federal income tax returns filed for each of the years in issue, and, if so, whether any part of the resulting underpayments in income tax was due to fraud. [2] Respondent concedes that absent a finding of fraud, assessment of additional tax for each of the taxable years 1960 through 1965 is barred by the running of the period of limitations on assessment. FINDINGS OF FACT Some of the facts *376 have been stipulated. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners Nicholas G. and Edna M. Hanna resided in Charleston, West Virginia, at the time they filed their petition in this proceeding. Petitioners filed joint Federal income tax returns for the taxable years 1960 through 1965 with the District Director of Internal Revenue at Parkersburg, West Virginia. Nicholas G. Hanna prepared all of those returns. Nicholas Hanna died after filing the petition herein and his estate has been substituted for him as a petitioner. Eleven months after their marriage in 1936, petitioners moved into a six-room apartment in Charleston, West Virginia, owned by Edna M. Hanna's father, where they resided for approximately 15 years. During this time, they were not required to pay rent and were allowed to keep all rents received from the rental of the three upstairs rooms. From 1937 to 1943, the Hannas operated a neighborhood grocery store. The store was sold in 1943, at which time petitioner began working in another grocery store for $45 per week. During 1951, petitioner purchased the grocery store he formerly owned and operated it at the *377 same location until 1956. In 1956, the Hannas purchased another building at 1429 Washington Street and operated the store at that location until its sale in the early 1970's. Petitioners worked hard and were required to spend long hours in operating their first store. After the store was reacquired in 1951, petitioners' children also participated in the operation of the grocery store. They never received any compensation for their work. The Hannas lived frugally during these years and saved money from the grocery business and the rental of the upstairs rooms so that some day they might retire. Nicholas Hanna liked to have cash money and enjoyed looking at it. He always carried three or four thousand dollars in loose cash in his pockets. The sales from the operation of Hanna's Super Market were reported under the accrual method of accounting. The procedure generally followed by petitioner in recording sales was as follows: (1) cash sales were rung up on the register and the money placed in the cash register; (2) credit sales were rung up on the cash register and entries made on separate tickets reflecting the charge sales, and at the end of the day credit sales were added to cash *378 sales in order to determine total sales; (3) when payments were made on credit sales, those payments were not reflected in the sales for that date, but rather the funds were simply deposited in the Hanna's Super Market checking account. On September 30, 1961, Nicholas and Edna Hanna purchased a parcel of real estate for rental purposes which was located at 1567 Lewis Street, Charleston, West Virginia, for $42,200. At the time of the purchase, petitioners assumed an outstanding loan on that property in the amount of $35,925.21. The difference between the $42,200 purchase price and the $35,925.21 loan assumption liability was paid by petitioners with checks drawn on the Hanna's Super Market checking account. On January 30, 1962, Nicholas and Edna Hanna purchased a parcel of real estate to be used for rental purposes for a total consideration of $20,800. To finance that transaction, petitioners borrowed $15,000 at the Kanawha Banking and Trust Company and withdrew another $4,225 from a personal savings account. On January 8, 1963, a parcel of real estate located at 1876 Ellette Place, Charleston, West Virginia, was purchased for a total consideration of $35,850. This property was *379 used as petitioners' residence. To finance this purchase, petitioners wrote a check in the amount of $6,000 which was drawn on the Hanna's Super Market account at Charleston National Bank and also a check in the amount of $15,609.02 which was drawn on the account of Mr. and Mrs. Hanna at the Kanawha Banking and Trust Company. In addition, the Hannas assumed an outstanding loan on that property which had a balance as of the date of purchase of $13,405.14. On January 1, 1964, petitioners purchased a parcel of real estate located at 1416 Washington Street, East, Charleston, West Virginia, to be used for rental purposes for a total consideration of $21,000. Petitioners paid Mr. G. N. Casto, Sr., the seller, by means of three checks in the total amount of $7,500. In addition, they gave a personal note in the amount of $13,500 to Mr. Casto to secure the outstanding indebtedness. In the summer of 1964, former Internal Revenue Service Agent Charles S. Meadows interviewed Nicholas Hanna pursuant to a routine examination of his income tax returns. During the interview, Hanna stated that he never had more than $1,000 in cash on hand at any one time and that, to his knowledge, his family had *380 no accumulation of cash. In the course of his examination, Mr. Meadows determined petitioner's unreported taxable income by the net worth method in which he allowed $1,000 for cash on hand at the beginning and end of each of the taxable years involved. On June 20, 1966, IRS Special Agent Grover C. Stuckey, Jr., conducted a personal interview of Nicholas Hanna. Mr. Hanna told Mr. Stuckey that he had approximately three or four thousand dollars in cash on hand at the end of each of the years 1960, 1961, 1962 and 1963 and that no member of his immediate family possessed any other cash during those years. He further stated that as of the date of the interview, he and his family had only about three or four thousand dollars in cash on hand. Agents of respondent obtained all books and other records in the possession of petitioner with respect to the taxable years 1960 through 1965 for use in their examination. The sales records from the operation of Hanna's Super Market were inadequate in that they contained no subsidiary records, such as cash register tapes, to verify the total sales figures on the adding machine tapes and in the summary sales records for any period. In addition, the *381 records of Hanna's Super Market contained no accounts receivable or inventory records for any period, and the purchases and expenses for the taxable year 1961 were not supported by expense invoices. Due to the inadequacy of the records of Hanna's Super Market, Special Agent Stuckey resorted to indirect methods of proof in determining income for the years in question. In the net worth and bank deposits computations made by Special Agent Stuckey, he used a $4,000 cash on hand figure for each of the years 1961 through 1965. On their joint Federal income tax return for 1960, petitioners reported merchandise purchased for Hanna's Super Market of $151,008.06. Included in the $151,008.06 were purchases by check in the amount of $110,646.73 and cash purchases in the amount of $40,361.33. The correct total for check purchases was $106,747.73, rather than $110,646.73 as reported. On petitioners' 1961 Federal income tax return, they reported merchandise purchases of $144,429.98, which included purchases by check in the amount of $104,608.35. The correct amount was $103,608.35, rather than $104,608.35. On their 1962 Federal income tax return, petitioners reported merchandise purchases of $144,614.08 *382 which included $103,035.03 in "credit" purchases. The correct amount of "credit" purchases for the taxable year 1962 was $102,035.03. During the taxable years 1961 through 1965, Nicholas G. and Edna M. Hanna reported gross receipts from business, rents and interest on their Federal income tax returns as follows: Year
Amount
1961
$178,342.42
1962
189,161.33
1963
189,961.02
1964
190,078.67
1965
199,735.92
Special Agent Stuckey, by use of the bank deposits method, determined that petitioners had gross receipts from business, rents, and interest as follows: Year
Amount
1961
$192,881.49
1962
202,103.80
1963
209,546.05
1964
202,825.66
1965
215,255.89
Special Agent Stuckey, by use of the bank deposits method, determined that petitioners understated their gross receipts on their Federal income tax returns in the following amounts: Year
Amount
1961
$14,539.07
1962
12,942.47
1963
19,585.03
1964
12,746.99
1965
15,519.97
On April 9, 1968, a Federal grand jury in Bluefield, West Virginia, returned a five count indictment against Nicholas G. Hanna for income tax evasion for the years 1961 through 1965. On January 20, 1972, Nicholas *383 G. Hanna entered a plea of guilty to Count 3 of the indictment pertaining to the taxable year 1963 before District Court Judge K. K. Hall in the United States District Court for the Southern District of West Virginia. The remaining four counts of the indictment were subsequently dismissed against Mr. Hanna upon motion of the United States Attorney. On March 27, 1972, the United States District Court for the Southern District of West Virginia entered its judgment order pursuant to the guilty plea of Nicholas G. Hanna in which petitioner was fined $10,000 and placed on probation for three years. The Commissioner, in his statutory notice of deficiency, determined that for the taxable year 1960 petitioner overstated merchandise purchases in the net amount of $2,900. The Commissioner further determined on the basis of net worth computations prepared for the taxable years 1961, 1962, 1963, 1964 and 1965 that petitioner understated his taxable income in the amounts of $19,618.31, $15,282.97, $22,674.29, $16,173.18 and $17,849.42, respectively. In making his determination, the Commissioner used a cash-on-hand figure of $4,000 as of December 31 of each of the taxable years 1960 through 1965. *384 The Commissioner also determined that part of the underpayments in tax for each of the taxable years 1960 through 1965 was due to fraud. ULTIMATE FINDINGS OF FACT 1. Respondent's determination of petitioners' assets and liabilities and adjustments to net worth for personal expenditures and nontaxable income is correct in all respects, except the determination of cash on hand. On December 31 of the following years, petitioner had cash on hand in the following amounts: Year
Amount
1960
$75,000
1961
65,000
1962
53,000
1963
41,000
1964
28,000
1965
14,000
2. Petitioners understated their taxable income for the taxable year 1963 in the amount of $10,674.29 with the intent to evade tax on the part of Nicholas G. Hanna. 3. No part of the understatements in taxable income for the taxable years 1960, 1961, 1962, 1964 and 1965 was due to fraud with the intent to evade taxes. OPINION The issues for decision are whether petitioners understated their taxable income on their Federal income tax returns for the taxable years 1960 through 1965, and, if so, whether any part of the resulting underpayments in income taxes was due to fraud on the part of Nicholas *385 G. Hanna. Respondent concedes that the assessment of additional taxes is barred by section 6501 (a) absent a finding of fraud. The issue of fraud is one of fact to be determined upon a consideration of the entire record. William G. Stratton,54 T.C. 255 (1970). The burden of proving fraud is placed upon respondent by section 7454. Fraud is never presumed. It must be affirmatively established by clear and convincing evidence. Anson Beaver,55 T.C. 85 (1970); Rule 142, Tax Court Rules of Practice and Procedure.Direct evidence of fraudulent intent is seldom available and whether it exists must be determined from the conduct of the taxpayer and the surrounding circumstances. Fraud must be proved for each year for which respondent seeks to avoid the statute of limitations and sustain the addition to tax for fraud, for proof of fraud for one year will not sustain the respondent's burden of proving fraud in another year. W. A. Shaw,27 T.C. 561 (1956), affd. 252 F.2d 681 (6th Cir. 1958); Thomas J. McLaughlin,29 B.T.A. 247 (1933). Respondent argues that the imposition of the fraud penalty against petitioner *386 for the taxable years 1960 through 1965 should be approved based on the following items as proof of fraud: (1) the "overfooting" of merchandise purchases in 1960, 1961, and 1962; (2) the possible omission of credit sales income; (3) the failure to report a net long-term capital gain on the sale of real estate in the amount of $1,817.25 in 1963; (4) understatements in taxable income for the years 1961 through 1965 based upon both net worth and bank deposits computations; (5) misrepresentations made to respondent's agents during the course of the examination; and (6) a plea of guilty to a charge of tax evasion for the taxable year 1963. Petitioner reported merchandise purchases of $151,008.06 on the 1960 Federal income tax return. Petitioner's purchases and expense records disclose check purchases of $110,646.73 and cash purchases of $40,361.33. The correct amount of check purchases was actually $107,646.73. The correct check purchases figure was initially entered in the purchases records, but was erased and written over for no apparent reason. Merchandise purchases were also overstated $1,000 in 1961 and 1962. Respondent maintains that the attempted concealment and overstatement *387 of the correct check purchases total for 1960, coupled with the "overfooting" of purchases in 1961 and 1962, constitute a pattern of understating taxable income which is evidence of fraudulent intent. Petitioner's daughter, Georgeann Hanna Faris, testified that her aunt assisted in the taking of inventory and that the check purchases figure for 1960 was in her aunt's handwriting. She further testified that the purchases records for the taxable year 1961 were in the handwriting of her sister, Mary Hanna, whereas the records for 1962 appeared to be in the handwriting of both her sister and herself. The mere understatement of income, standing alone, is not sufficient to support a finding of fraud. However, the consistent understatement of large amounts of income over a period of years is evidence of willful intent to evade. Epstein v. United States,246 F.2d 563 (6th Cir. 1957), cert. denied 355 U.S. 868 (1957). The overstatement of approximately $5,000 in merchandise purchases over a three-year period hardly establishes a pattern of understating large amounts of taxable income. Furthermore, the overstatements of merchandise purchases were small in relation *388 to the total purchases for each year. After considering the size of the overstatement in 1960 together with the testimony concerning the preparation of the purchases records, we conclude that respondent has failed to prove by clear and convincing evidence that the understatement in taxable income 1n 1960 was due to fraud. Respondent urges us to sustain the deficiency determinations for the years 1961 through 1965 which were based on the net worth method of determining income and the fraud penalties imposed for the respective years. Petitioners first contend that use of the net worth method is confined to those situations where the taxpayer has no records or the records are inadequate. Petitioners next contend that even if we find the records of Hanna's Super Market to be inadequate, the cash-on-hand figures used in the net worth computation were incorrect. As indicated in our findings, the records of Hanna's Super Market were inadequate. However, even if the records had been adequate, respondent would not have been precluded from resorting to indirect methods of proof because the proposition urged by petitioner, i.e., that the net worth method should not be used unless there are *389 inadequate or no records on which an audit may be performed, was expressly rejected in Holland v. United States,348 U.S. 121 (1954), rehearing denied 348 U.S. 932 (1955). With respect to petitioners' second argument, we recognize that an essential condition in net worth cases "is the establishment, with reasonable certainty, of an opening net worth." Holland v. United States,supra.
Petitioners claim that respondent failed to include in the opening net worth figure approximately $75,000 in currency which was hidden in various parts of their home on December 31, 1960. Petitioners asserted that the cash had been accumulated since their marriage in 1936 and was not spent until they began acquiring real estate in 1961. To support their claim, petitioners introduced the testimony of several persons. Mr. Albert Risk, a relative of petitioners, testified as to Nicholas Hanna's habit of always carrying three or four thousand dollars in loose cash in his pockets. George Hanna and Georgeann Hanna Faris, petitioners' children, attested to the existence of substantial amounts of cash being hidden in the Hanna's home before the years in question. *390 Edna Hanna traced the manner in which the alleged cash hoard was accumulated over the years, the amount of such accumulation, and how approximately $60,000 of such cash was used in acquiring real estate and other items of personal property. Mr. Victor Johnson, a local banker, revealed that on two occasions George Hanna brought currency to the bank for redemption which had been hidden in the damp basement of petitioners' home and had become fused together. On the second such occasion, a check for $6,935 was received in exchange for the damaged currency. To dispute the cash hoard claim, respondent relies upon the following: (1) Nicholas Hanna's statements to Special Agent Stuckey concerning the amount of cash on hand as of the beginning of each year in question; (2) the fact that the bank deposits were regular and periodic, thus giving the appearance of current business receipts; (3) the failure of the bank statements and deposit slips to reveal the deposits of cash in even amounts allegedly made by Edna Hanna prior to each real estate transaction; (4) Nicholas Hanna's meager earnings during at least part of the accumulation period; and (5) the inference that anyone with large amounts *391 of cash on hand would not incur interest-bearing obligations and convert incomeproducing investments to cash for use in the acquisition of real estate. The $4,000 cash-on-hand figure used in the net worth computation was based on testimony given by Nicholas Hanna in the office of the Intelligence Division of the Internal Revenue Service at Charleston, West Virginia, on June 20, 1966. On pages 6, 7, and 8 of the question and answer statement, a transcription of Nicholas Hanna's taped testimony, appears the following: Q-48
How much cash or ready money did you have
on hand at December 31, 1960, that would
have been the end of 1960?
A
Well I really don't know. I couldn't tell
you exactly.
Q-49
Well would you have any idea?
A
You mean in business?
Q-50
I mean cash any place except in a bank
account. I mean cash you had in your
pocket, at home or in a safe deposit box
or cash any place except in a bank account.
A
Well, possibly maybe three or four thousand
dollars.
Q-51
Three or four thousand dollars at the end
of 1960.
A
Probably would, uh huh, I'm not exactly sure.
I couldn't answer truthfully.
Q-52
And where would that cash have been at, sir?
A
Well, probably some of it in the store, you
know, for businss purposes.
Q-53
How much would you say of that three or
four thousand dollars would have been in the
store?
A
Golly, I really wouldn't know for sure.
Q-54
Uh, how much cash or ready money was being
held for you by your wife, relatives or others
as of December 31, 1960?
A
None.
Q-55
Did your wife or any other member of your
immediate family own any cash as of
December 31, 1960?
A
No, it was all joint.
Q-63
How much cash or ready money do you have on
hand at the present time?
A
Well, do you mean business and everything?
Q-64
I mean, yes sir, cash any place except in a
bank account.
A
Well, I don't know. I would say usually [I]
have around three thousand, four thousand,
about the same amount as I had before.
Q-65
And that there is the cash that you use in
the operation of the store?
A
In the operation of the store, uh huh.
Q-68
Uh, how much cash or ready money did you and
your wife have on hand at December 31, 1961?
A
I suppose it would be about the same amount.
Q-69
Uh, how much cash or ready money did you and
your wife have on hand at December 31, 1972?
A
It would be about the same amount because it
just works in with the store there.
*392 Petitioner's answers to questions 65 and 69 give the impression that the cash to which he was referring was that which he kept in his pockets for use in the operation of his store. Such a conclusion finds support in the testimony of Mr. Risk and George Hanna as to petitioner's habit of always carrying $3,000 or $4,000 in loose cash in his pockets. Even assuming that petitioner fully understood the questions concerning the amounts of cash on hand on the various dates, as indicated by Edna Hanna's testimony, we can readily understand a person's reluctance to reveal the existence of a carefully hidden lifetime savings to a total stranger. This would be expecially true in the case of Nicholas Hanna, who knew nothing of the purpose of the interview nor the importance of the questions respecting cash on hand at the time such questions were asked. Respondent contends that the failure of the bank statements and deposit slips to reveal deposits of cash in even amounts allegedly made by Edna Hanna at or about the time of the real estate acquisitions seriously detracts from the credibility of her testimony as to the existence of a cash hoard. With respondent's assertion, we cannot agree. *393 That her memory as to the exact manner in which certain bank deposits were made may have been obscured by the passage of some ten to thirteen years hardly seems unlikely. Petitioners' bank statements show deposits of $7,679.12 on January 7, 1963, the day before petitioners purchased their home at 1876 Ellette Place. The sum is substantially greater than the other periodic deposits which averaged under $3,000 and does not include the proceeds from the redemption of the savings bonds which were deposited on January 8, 1963. In addition, the bank statement from petitioners' grocery store checking account contains an irregular deposit on December 23, 1963, and a deposit larger than normal on January 6, 1964, two dates very close in time to the purchase of Mr. Casto's property. Furthermore, the facts reveal numerous cash transactions by petitioners, such as approximately $40,000 in merchandise purchases in 1961, 1962 and 1963. The accumulated cash could have been used partly for merchandise purchases rather than being deposited directly into the checking accounts so as to conserve the funds in such accounts for the acquisition of real estate. Finally, respondent's argument appears to be *394 based on the assumption that Edna Hanna testified that all or a substantial portion of the hidden cash was used to make downpayments on the real estate acquired during those years. Such is not the case. She testified that some of the cash was used to make payments on the real estate loans and to purchase furniture. Having carefully observed her demeanor on the witness stand, we find her testimony worthy of belief. Respondent maintains that based on the testimony of Edna Hanna only $36,000 of the cash accumulation came from sources other than savings of business income. Respondent's position is that considering the size of petitioner's income during at least a part of the accumulation period, it is doubtful that the Hannas could have saved nearly $40,000 from the operation of the grocery store and the rental income during the accumulation period. Suffice it to say that savings of approximately $40,000 over a period of 24 years hardly seems incredible. From 1937 until about 1952 the Hannas lived rent-free in an apartment owned by Edna Hanna's father and were allowed to keep all monies received from the rental of the three upstairs sleeping rooms. As a grocer, Nicholas Hanna was able *395 to obtain all food for his family at wholesale prices, thus resulting in substantial savings. Furthermore, the Hannas worked hard in the operation of the store and lived frugally prior to the years in issue. Not until 1961 did petitioners begin to acquire real estate and other items of personal property, such as furniture, with the hidden cash. Respondent finally asserts that anyone with large amounts of cash on hand would not incur interest-bearing obligations and convert income-producing investments to cash for use in the acquisition of real estate. We recognize that as a general rule that proposition is correct. However, the Fifth Circuit in Phillips' Estate v. Commissioner,246 F.2d 209 (5th Cir. 1957), in recognizing that some persons, for various reasons, do hoard cash, stated at page 213: In establishing that opening net worth all types of assets (less liabilities) are included. Perhaps from a conceptual point of view, cash stands no differently than other property. But the history of these cases and human experience generally compels a recognition that cash is different. From ignorance, apprehension of bank deposits, furtive desire to conceal gains, illgotten *396 or belonging to others, the sometimes irresistible response to the appeal of miserly greed or a variety of other reasons grounded in the everyday experience of mankind, people do hoard cash. Physically, in contrast to other accumulations, it is easy to hoard and with some reasonable security. And, negotiable as it is by the simple act of delivery, when spent, unlike checks or drafts, it leaves no telling prints to track from whence it came. The facts clearly show that Nicholas Hanna kept substantial amounts of cash hidden in his home. The testimony of petitioners' witnesses, a careful examination of petitioners' returns filed prior to and during the net worth period, and petitioners' mode of living contradict a cash on hand figure of $4,000 as of December 31, 1960. We have therefore exercised our best judgment and discretion, based on the evidence before us, in finding the various amounts of cash on hand as set forth in our findings. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). For the year 1963, Nicholas G. Hanna was convicted of willfully attempting to evade income tax by means of filing a false and fraudulent return in violation of section 7201 [4] of *397 the Internal Revenue Code of 1954. It is now well-settled that the criminal judgment of conviction requires application of the doctrine of collateral estoppel and that, as to him, at least part of any underpayment of tax for the taxable year 1963 must be deemed already to have been judicially determined to be "due to fraud" within the meaning of section 6653(b). [5]Moore v. United States,360 F.2d 353, 356 (4th Cir. 1966), cert. denied 385 U.S. 1001 (1967); John W. Amos,43 T.C. 50, 55 (1964), affd. 360 F.2d 358 (4th Cir. 1965). That Nicholas G. Hanna's conviction resulted from a plea of guilty to the criminal charges brought against him rather than from a trial on the merits after a plea of not guilty, does not change the applicable rule. Arctic Ice Cream Co.,43 T.C. 68 (1964). A plea of guilty is a conviction; it is as conclusive as a jury's verdict, and it leaves nothing for the court to do but give the judgment and the sentence. Kercheval v. United States,274 U.S. 220, 223 (1927). Petitioner's estate as a party here is no different from petitioner in the criminal case. We, therefore, *398 hold that the conviction of Nicholas Hanna collaterally estops his estate from denying that at least a part of the underpayment of tax for 1963 was due to fraud. We now turn to the question of the amount of underpayment of tax for *399 the taxable year 1963. Count 3 of the indictment to which Nicholas Hanna pleaded guilty stated that petitioner's taxable income for 1963 was $32,339.69. For the doctrine of collateral estoppel to apply to conclusively establish a fact in question, determination of that fact must have been necessary or essential to the result in the first suit and the fact in question must be an "ultimate" fact for determination in the second suit. A conviction under section 7201 does not require the proving of any definite sum of taxable income, only the omission of a substantial amount. Moore v. Commissioner,supra. Since the determination of the exact tax liability was not "essential to the judgment," a prerequisite to the application of the doctrine of collateral estoppel, there is no basis for the application of the estoppel doctrine against either respondent or petitioner in respect to the amount of taxes due. Based upon our adjustments to the cash-on-hand figures used in respondent's net worth computation, we find that Nicholas Hanna understated his taxable income for the year 1963 in the amount of $10,674.29. After substituting our cash-on-hand figures for those used by respondent, *400 based on the net worth computation for the taxable years 1961, 1962, 1963, 1964 and 1965, petitioner understated his taxable income in the amounts of $9,618.32, $3,282.97, $10,674.29, $3,173.18 and $3,849.49 for those respective years. However, we recognize that the net worth technique "is not an accurate method and its results are at best approximations." Goldberg v. Commissioner,239 F.2d 316 (5th Cir. 1956). The question of whether Nicholas Hanna fraudulently understated his taxable income with the intent to evade taxes for the taxable years 1961, 1962, 1964 and 1965 must be determined independently of our finding of fraud for the taxable year 1963, for proof of fraud for one year will not sustain respondent's burden of proving fraud in another year. Thomas J. McLaughlin,29 B.T.A. 247 (1933). Respondent maintains that the additions to tax for fraud for the years 1961, 1962, 1964 and 1965 should be sustained primarily on the basis of the understatements in income for the years 1961 through 1965 based on the net worth computation, the possible under reporting of credit sales income, and a plea of guilty entered by Nicholas Hanna to a charge *401 of income tax evasion for the taxable year 1963. As previously stated, the mere understatement of taxable income, standing alone, is not sufficient to support a finding of fraud; whereas evidence of a consistent pattern of understating large amounts of income will support an inference of willfulness. Holland v. United States,348 U.S. 121 (1954), rehearing denied 348 U.S. 932 (1955). After making the adjustments to the cash-on-hand figures used in the net worth computation, the understatements of taxable income, while not insignificant, fail to establish a pattern of failing to report large amounts of income over a period of years. Only in the years 1961 and 1963 were large amounts of income not reported. Even had the understatements been more substantial, we have previously held that there must be something more in order to meet the "clear and convincing" test in those cases where the understatements are determined under the net worth method. John Marinzulich,31 T.C. 487 (1958). The evidence presented by respondent respecting the possible omission of credit sales income is based upon an analysis of sales information of 23 separate *402 dates during the years 1961 through 1965. The particular dates were used because they represent the only dates on which the word "credit" appeared on the adding machine tapes. We find the evidence too conjectural to be accorded much weight. At most, it only creates a suspicion of willful omission. The issue of fraud must never be decided under circumstances which at most create only a suspicion. Goldberg v. Commissioner,supra.
Respondent also seeks to impute Nicholas Hanna's plea of guilty to the charge of tax evasion for the taxable year 1963 to the other years in issue. Both George and Edna Hanna testified that he pleaded guilty due to his doctor's belief that the strain of a criminal trial would have gravely imperiled his health. In light of the above testimony, we find that the guilty plea has little bearing on petitioner's state of mind during the other years in question. After a careful review of the facts before us, we are left with the impression that the understatements in income for the taxable years 1961, 1962, 1964 and 1965 were more likely the result of petitioner's haphazard method of recordkeeping than the willful intent to evade taxes. Accordingly, *403 we conclude that respondent has failed to carry his burden of proving fraud for the years 1961, 1962, 1964 and 1965 by clear and convincing evidence. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. Respondent concedes that no part of the underpayment in income tax is due to fraud on the part of Edna M. Hanna.↩
4. SEC. 7201. ATTEMPT TO EVADE OR DEFEAT TAX Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution. ↩
5. SEC. 6653. FAILURE TO PAY TAX (b) FRAUD. --If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.↩